**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0131n.06

**No. 09-6060**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF TENNESSEE |
| RENE MONTGOMERY, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:  GRIFFIN and KETHLEDGE, Circuit Judges; and BERTELSMAN, District Judge.[*]

GRIFFIN, Circuit Judge.

Defendant Rene Montgomery pled guilty, pursuant to a plea agreement, to three counts of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). Montgomery now timely appeals from the fifty-seven month sentence imposed by the district court, arguing that the court erred in cross-referencing and sentencing him for attempted second-degree murder under U.S.S.G. §§ 2K2.1(c)(1)(A) and 2A2.1(a)(2).  We disagree and affirm.

I.

On February 20, 2006, officers with the Memphis Police Department responded to a shooting at 3758 Argonne, a residence in Memphis, Tennessee.  At the scene, officers encountered the victim

---

[*]The Honorable William O. Bertelsman, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

and owner of the residence, Debra Johnson, who indicated that she was asleep in her bedroom when she heard multiple shots being fired into the residence.

Inside the residence, officers recovered a gun belt, which held two ammunition magazines loaded with 9mm caliber R&P Luger ammunition. The officers retrieved one live round of 9mm caliber ammunition from the belt for ballistic testing. Johnson identified the gun belt as belonging to her ex-boyfriend, defendant Rene Montgomery. Johnson advised the officers that, just prior to the shooting, she and Montgomery had a "heated argument" about paying bills, and that as a result of the argument, Montgomery moved in with his long-time friend David James. In addition, Johnson testified that, following this argument, she withdrew $500 from her bank account – at Montgomery's request – and provided him with the money.

Officers located three bullet holes in the living room, two bullet holes in Johnson's bedroom, and two bullet holes in the middle bedroom. The officers, however, were only able to recover four bullet fragments, all of which were later identified as .380 caliber bullets. Johnson subsequently advised the police that James carried a .380 caliber firearm.

Outside the residence, officers recovered three 9mm caliber R&P Luger shell casings in the street near the driveway, as well as eleven .380 caliber shell casings in the front yard on top of the snow. Crime scene investigation ("CSI") officers confirmed that the 9mm caliber R&P Luger shell casings matched the ammunition found on Montgomery's gun belt. Officers also found "two sets of tracks" in the snow near the .380 caliber shell casings, and multiple footprints "going up into the yard" from the curb of the street where the 9mm caliber shell casings were located.

With officers present, Johnson attempted to call Montgomery, who was supposedly staying at James' residence. Johnson, however, was only able to speak with James' girlfriend, who indicated that Montgomery and James were asleep. Although Johnson informed James' girlfriend that her house had been "shot up," she refused to put Montgomery on the phone, insisting that she was not allowed to wake him.

On February 21, 2006, officers arrested Montgomery with the cooperation of Johnson. During a search of Montgomery's person incident to the arrest, officers recovered a Smith & Wesson 9mm caliber semi-automatic pistol. The weapon was loaded with fifteen live rounds in the magazine.

Montgomery admitted that the firearm was his and that he had been in possession of it when the shooting at Johnson's residence took place. However, Montgomery denied any involvement in the shooting, claiming instead that the 9mm caliber shell casings recovered from the scene were left behind when he and his nephew fired two magazines of 9mm caliber ammunition on December 31, 2005 – two months before the shooting. Johnson further claimed that he was at James' residence at the time of the shooting and refused to return Johnson's calls "because he thought she was just playing to get him to come to the phone."

On December 18, 2007, a federal grand jury returned a four-count indictment, charging Montgomery in counts one, two, and three with being a felon in possession of the 9mm caliber firearm recovered from his person, as well as being a felon in possession of the one live round of 9mm caliber ammunition and three 9mm caliber shell casings recovered from Johnson's residence.

In exchange for dismissal of the fourth count, relevant conduct that occurred nearly one year after the shooting, Montgomery pled guilty to counts one, two, and three of the indictment.

To assist in Montgomery's sentencing, a Presentence Investigation Report ("PSR") was prepared, in which Montgomery, pursuant to U.S.S.G. § 2K2.1, was assigned an initial offense level of 18.[1] However, pursuant to U.S.S.G. § 2K2.1(c)(1)(A),[2] Montgomery's offense level was cross-referenced to attempted second-degree murder under U.S.S.G. § 2A2.1(a)(2). As a result of the cross-reference, Montgomery was assigned a new base offense level of 24 (including acceptance of responsibility) and a criminal history category of II, resulting in an applicable Guidelines range of 57-71 months' imprisonment.

On September 1, 2009, the district court held a sentencing hearing at which it considered Montgomery's objection to the cross-reference to attempted second-degree murder. Following the government's proof, the court held that the cross-reference was appropriate, finding that "it is more

---

[1]Montgomery was initially assigned an offense level of 14 pursuant to U.S.S.G. § 2K2.1(a)(6)(A), but that level was enhanced four levels pursuant to U.S.S.G. § 2K2.1(b)(6) for possession in connection with another felony offense, resulting in a total offense level of 18.

[2]Section 2K2.1(c)(1)(A) directs that:

If the defendant used or possessed any firearm or ammunition in connection with the commission or attempted commission of another offense . . . with knowledge or intent that it would be used or possessed in connection with another offense, apply . . . § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense, if the resulting offense level is greater than that determined [under U.S.S.G. § 2K2.1.]

Section 2X1.1(c)(1) provides: "When an attempt, solicitation, or conspiracy is expressly covered by another offense guideline section, apply that guideline section."

likely [than not] that the defendant was there shooting in the house." After reaching this conclusion, the court adopted the Guidelines calculation in the PSR, thus giving Montgomery an applicable Guidelines range of 57-71 months. The court then sentenced Montgomery to concurrent terms of 57 months' imprisonment.

Montgomery now timely appeals.

II.

In this appeal, Montgomery asserts that the district court erred in determining that he was criminally responsible for attempted second-degree murder, arguing that "[i]t was clearly erroneous for the Court to find that the evidence preponderated in favor of the defendant[] having been present and deliberately firing into the victim's bedroom." Because a determination of criminal responsibility is a mixed question of law and fact, we review it de novo. *See United States v. Whited*, 473 F.3d 296, 297 (6th Cir. 2007). Facts employed by the district court to decide criminal responsibility are reviewed for clear error. *See United States v. Katzopoulos*, 437 F.3d 569, 574 (6th Cir. 2006).

To establish attempted second-degree murder, the government was required to demonstrate by a preponderance of the evidence that Montgomery acted with "malice aforethought," *United States v. Milton*, 27 F.3d 203, 206 (6th Cir. 1994), and that Montgomery "committed an overt act that constitute[d] a 'substantial step' toward commission of the crime." *United States v. Wesley*, 417 F.3d 612, 618 (6th Cir. 2005). "Malice aforethought may be inferred when the defendant grossly deviates from the standard of care to such an extent that a jury could conclude that he must have

been aware of a serious risk of death or serious bodily injury." *United States v. Conatser*, 514 F.3d 508, 523 (6th Cir. 2008) (citations and internal quotation marks omitted); *see also United States v. Campa*, 529 F.3d 980, 1009 (11th Cir. 2008) ("'Malice aforethought' is a legal term of art that describes the several mental states that are associated with murder.").

III.

The district court did not clearly err in its findings of fact. In deciding that Montgomery was criminally responsible for attempted second-degree murder, the court emphasized that Montgomery "had a reason to be there[,]" having "just had a fight with Ms. Johnson" that resulted in Montgomery moving out and withdrawing $500 from Johnson's bank account – acts indicating "that something ha[d] changed in the relationship." The court noted further that Montgomery was familiar with the layout of Johnson's home, thus explaining how the shooters clearly knew which room was Johnson's bedroom.

Most importantly, ballistic testing confirmed that the three 9mm caliber shell casings recovered from the scene had been fired from the 9mm caliber firearm recovered from Montgomery one day later – the firearm that Montgomery admitted was with him at the time of the shooting. The district court specifically rejected Montgomery's explanation that the 9mm caliber shell casings had been sitting in the street for nearly two months, reasoning that, in light of the recent weather, they would have been washed away over that duration of time. Moreover, the court noted that Montgomery did not have a reliable alibi for the night in question, opining that James' girlfriend "frankly could be regarded as having either covered for [Montgomery and James] or provided no

useful information, one of the two." The district court thus concluded, based on its findings, that Montgomery "acted in such a reckless way . . . as to place [Johnson's] life in immediate danger" and that the shooting was "for the purpose of causing [Johnson] serious injury or death."

Montgomery asserts that the aforementioned evidence does not preponderate in favor of the cross-reference to attempted second-degree murder. In support of this assertion, Montgomery proffers five arguments: (1) Johnson testified that David James carried a .38 caliber firearm, not a .380 caliber firearm; thus, the eleven .380 casings police recovered from the scene could not have come from James' gun; (2) the bullets fired into Johnson's bedroom were "apparently fired from, more or less, directly in front of the bedroom[,]" and thus, "could not have been fired from the opposite end of the house at the driveway" where the 9mm caliber shell casings were recovered; (3) no footprints were located near the 9mm caliber shell casings, and "it was not determined whether the footprints in the yard were made by one, or more than one, person"; (4) Montgomery's explanation about the three 9mm caliber shell casings was "credible"; and (5) the sentencing court contradicted its finding that Montgomery was present by stating that "he may have been there, we don't know."

These arguments are easily dismissed. First, Johnson simply misspoke when she testified that James carried a .38 caliber firearm, rather than a .380 caliber firearm. Johnson told police that James carried a .380 caliber firearm – a statement acknowledged by defense counsel. Regardless, Johnson's inconsistency is not dispositive of whether Montgomery participated in the shooting. Second, Montgomery's assertion that the shots were "apparently fired from, more or less, directly

in front of the bedroom," and thus, "could not have been fired from the opposite end of the house at the driveway" is unsupported in the record. Montgomery offered no testimony or evidence as to this assertion, nor does any of the evidence presented to the district court support this assertion. Third, despite Montgomery's assertion otherwise, the government provided testimony that although there were no visible footprints *in the street* near the three 9mm caliber shell casings, there were multiple footprints in the snow leading from the area of the street where the 9mm caliber shell casings were found into the front yard of the residence. A CSI officer also testified that there were two sets of tracks near the .380 caliber shell casings. Thus, Montgomery's assertion is contrary to the record.

As for Montgomery's fourth argument, it was not clearly erroneous for the district court to determine that Montgomery's explanation for the presence of the three 9mm caliber shell casings was not credible. *See United States v. Hurst*, 228 F.3d 751, 761 (6th Cir. 2000) ("The sentencing court's credibility determinations, like other factual findings, must be accepted on review unless shown to be clearly erroneous."). Johnson discredited this claim, testifying that the last time someone used a firearm at her residence was "five or six years" before the shooting. And, at that time, the weapon used was a .380 caliber firearm, not a 9mm caliber firearm. Moreover, even if Montgomery had fired his weapon on December 31, 2005, it is unlikely that the shell casings would have remained in the street for two months. As the district court noted, "they would not still be in the gutter, they would be washed away."

Finally, regarding Montgomery's fifth argument, the record does not show that the district court contradicted its finding that Montgomery was present at the time of the shooting. The district court was referring to David James, not Montgomery, when it stated "he may have been there, we don't know . . . ." The district court, having already stated that "[t]he evidence preponderates in favor of a determination that this was a shooting by [Montgomery,]" began discussing whether the evidence demonstrated that James was present during the shooting, indicating it was less clear whether he was present. Thus, Montgomery's fifth argument is not supported by the record.

In conclusion, the district court's findings appear well founded in fact and, certainly, are not clearly erroneous. Montgomery's arguments to the contrary are either unsupported or contrary to the record. Accordingly, the district court did not err in applying the attempted second-degree murder cross-reference.

IV.

For these reasons, we affirm the judgment of the district court.