NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0158n.06

Case No. 17-1846

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 27, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE WESTERN DISTRICT OF |
| | ) | MICHIGAN |
| DEMETRIUS VINEY, JR., | ) | |
| | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |
| | ) | |

**BEFORE: GILMAN, ROGERS, and BATCHELDER, Circuit Judges.**

**RONALD LEE GILMAN, Circuit Judge.** Demetrius Viney, Jr. appeals his sentence of 100 months' imprisonment for the offense of being a felon in possession of a firearm. His sole argument on appeal is that the district court erroneously applied a cross-reference to attempted murder under the United States Sentencing Guidelines (U.S.S.G.) when calculating his sentencing range. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

**I. BACKGROUND**

**A.     Factual background**

Viney first encountered Adam Young, who would eventually become the target of the alleged attempted murder, when Young broke up a fight between Viney and Young's cousin at a

bar in Saugatuck, Michigan. The fight had arisen over Viney's love affair with the cousin's girlfriend. After Young broke up the fight, his sister Tameka heard Viney say "It's war" and "I've got that thing," which she understood to mean that Young needed to "make sure [that he was] protected" and that Viney had a gun. The encounter ended without further incident.

Viney next encountered Young a week or two later at a hookah lounge in Holland, Michigan well after midnight. Each man was there with his own group of friends. Young's group again included his sister Tameka. Among Viney's group was his friend Levell Turner, who later testified that, at the hookah lounge, Viney was "lifting up his shirt like he was hot," "possibly" displaying a pistol in his waistband.

Viney and Young did not interact until around 3:00 A.M., when Young and Tameka were leaving. At that point, Viney began taunting Young with "fighting words," saying "What's up?" and "I got it." Tameka again understood this to mean that Viney had a gun. "The comments," she recalled, "were still goin' as we were walkin' out the door."

Viney followed Young and Tameka out of the hookah lounge and into the parking lot. Tameka recalled that Viney was "grabbing his waist" and saying "What's up? What's up?" Viney then drew a pistol and, from about six feet away, pointed it at Young's face.

Young "swiped" or "slapped" at the gun. He made contact with it (or with Viney's hand, or both) and, according to Tameka, "that's when [Viney] shot the gun like to the side, to the left of [Young], two or three times," "[l]ike to the ground." Tameka was standing near Young when the gun went off, and the first shot caused her to "kind of black[] out a little bit." Then, she said, "everybody is runnin', includin' me, my brother. I'm runnin', he's slowly walkin' behind, and that's when I hear more gunshots." The record is unclear as to who fired the additional shots, but

by the time the gunfire ceased, one of Viney's friends had been fatally wounded by another shooter. Young and Tameka were unscathed.

Contradicting Tameka's account, Young testified at the sentencing hearing that, after he swiped at Viney's gun, it fired only once. But the district court "completely discount[ed]" this testimony because, as the court noted, Young "took a breezy attitude" on the witness stand, "as though he was almost amused to be [t]here," and "looked like he wasn't in complete possession of his faculties," similar to a person who was "high on drugs."

Accordingly, the district court relied on the testimony of Tameka and the other three witnesses, which it found more credible. The court thus found that Viney's gun had fired at least two shots in quick succession after Young swiped at it. From that fact, the court inferred that Viney had fired at least one of the shots intentionally. The court also found that Viney had fired "directly at or in the direction of" Young, intending to kill him.

## B.    Procedural background

Viney pleaded guilty to being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). In calculating the applicable Guidelines range, the district court applied a cross-reference provision in U.S.S.G. § 2K2.1(c)(1)(A) that is triggered whenever a defendant who is convicted under the felon-in-possession statute possessed the firearm "in connection with the commission or attempted commission of another offense." Based on the evidence presented at Viney's sentencing hearing, the court determined that Viney had possessed the firearm in connection with an attempt to murder Young. The court therefore used the base offense level for attempted murder, pursuant to U.S.S.G. § 2X1.1(a), to calculate Viney's applicable Guidelines range. That resulted in a recommended term of imprisonment of 100 to

120 months.  The court then sentenced Viney at the low end of that range, to be followed by three years of supervised release.  This timely appeal followed.

## II.  ANALYSIS

### A.  Standard of review

The district court's factual findings are reviewed under the clear-error standard.  *United States v. Katzopoulos*, 437 F.3d 569, 574 (6th Cir. 2006).  Its application of the Guidelines, including its decision to apply the cross-reference, is reviewed de novo.  *United States v. Milton*, 27 F.3d 203, 206 (6th Cir. 1994).

### B.  The district court's factual findings are not clearly erroneous.

We will first review the district court's factual findings, which formed the basis for its application of the Guidelines.  Viney explicitly challenges the finding that his gun went off multiple times immediately after Young swiped at it, as well as the concomitant finding, inferred therefrom, that at least one of these firings was intentional.  Moreover, by arguing that he intended only to scare or intimidate Young, Viney implicitly challenges the finding that he fired "directly at" Young.

A finding "is 'clearly erroneous' when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).  But "appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*."  *Id.* (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123 (1969)).  "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse [the lower court's findings] even though convinced that had

it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 573–74.

"Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Moncivais*, 401 F.3d 751, 755 (6th Cir. 2005) (quoting *Anderson*, 470 U.S. at 574). This is true "even when the district court's findings do not rest on credibility determinations, but are based instead on . . . inferences from other facts." *Id.* (quoting *Anderson*, 47 U.S. at 574).

As to the finding that Viney's gun fired more than once, four of the five witnesses at the sentencing hearing testified that it did. Tameka recalled "two or three" gunshots. So did a woman who happened to be in the parking lot at the time of the shooting and did not know any of the involved parties. Another disinterested witness similarly recalled an opening burst of "three or four" gunshots in "fairly quick succession," "like whomever was holding the gun got excited and just kept pressing as fast as possible." The brother of the man who was fatally wounded recalled "[p]robably two" initial gunshots.

Young himself recalled only a single gunshot, but the district court discounted his testimony as not credible. The record supplies no reason to second-guess this credibility determination, which must be accepted on appeal unless clearly erroneous. *See United States v. Hurst*, 228 F.3d 751, 761 (6th Cir. 2000). Accordingly, the finding that Viney's gun went off multiple times must be sustained.

Viney next disputes that he fired the gun intentionally, which the district court inferred from the fact that the gun went off multiple times. Recognizing that the gun could have gone off accidentally when Young made contact with it or with Viney's hand, the court made no finding as to the intentionality of the first gunshot. But the court inferred that the additional gunshots were intentional. This inference logically follows from the absence of any evidence that Viney

lost control of the gun for more than an instant after Young swiped at it. The court's inferential finding is therefore not clearly erroneous.

Viney also implicitly challenges, by his insistence that he intended only to scare or intimidate Young, the finding that he "fired [the gun] directly at or in the direction of Mr. Young." But Tameka testified that, after Young swiped at the gun, Viney "shot the gun like to the side, to the left of him, two or three times," "[l]ike to the ground." At the very least, this supports the finding that Viney shot in Young's vicinity, more toward him than away from him. The district court therefore did not clearly err in finding that Viney shot in Young's direction.

Whether the district court erred in finding that Viney shot "directly at" Young is a closer question. None of the witnesses testified that they saw Viney shoot directly at Young. But after Young swiped at the gun and it went off, no one waited around to see how effectively Viney would correct his aim. As soon as the shooting started, Tameka said, "everybody [was] runnin'." Under these circumstances, the fact that none of the witnesses testified to seeing Viney shoot "directly at" Young does not make the court's finding that he did so clearly erroneous.

And even if Viney did not shoot "directly at" Young, this does not resolve the issue of whether Viney *intended* to shoot him. *See, e.g.*, *United States v. Sanders*, 472 F. App'x 376, 381 (6th Cir. 2012) (affirming the application of the cross-reference despite the defendant's contention that he obviously did not intend to kill the victim because he "stopped ten feet short, unloaded only two of the six bullets in the gun, and did not pursue [the victim] to finish the job"). The finding that Viney *tried* to shoot "directly at" Young, but failed to do so because Young maneuvered out of the way by swiping at the gun and running, is not implausible and is therefore not clearly erroneous. *See Anderson*, 470 U.S. at 574.

**C.      The district court did not err in applying the cross-reference.**

Viney next challenges the application of the cross-reference to attempted murder.  To apply the cross-reference, the district court had to conclude, by a preponderance of the evidence, that Viney's "conduct satisfied the Guidelines' definition of the cross-referenced offense."  *See United States v. Milton*, 27 F.3d 203, 206 (6th Cir. 1994).  The Guidelines define second-degree murder by reference to 18 U.S.C. § 1111(a), which defines it as "the unlawful killing of a human being with malice aforethought."  *See* U.S.S.G. § 2A1.2 (citing in commentary to 18 U.S.C. § 1111(a)).  To establish attempted second-degree murder, therefore, the government had to prove that Viney possessed the necessary intent for the criminal activity—here, malice aforethought—and "committed an overt act that constitutes a 'substantial step' toward commission of the crime."  *See United States v. Wesley*, 417 F.3d 612, 618 (6th Cir. 2005).

"Malice aforethought may be inferred when the defendant 'grossly deviates from the standard of care to such an extent that a [factfinder] could conclude that he must have been aware of a serious risk of death or serious bodily injury.'"  *United States v. Conatser*, 514 F.3d 508, 523 (6th Cir. 2008) (quoting *United States v. Sheffey*, 57 F.3d 1419, 1430 (6th Cir. 1995)).  This is not to say, however, that a mental state of recklessness suffices to create liability for attempted second-degree murder.  It does not.  "[A]n attempt to commit murder requires a specific intent to kill."  *Braxton v. United States*, 500 U.S. 344, 351 n.* (1991) (quoting 4 C. Torcia, Wharton's Criminal Law § 743, p. 572 (14th ed. 1981)).  But a defendant's gross deviation from a reasonable standard of care permits an inference of that specific intent.  *Milton*, 27 F.3d at 208.

Viney contends that his case is analogous to *United States v. Morgan*, 687 F.3d 688 (6th Cir. 2012) [hereinafter *Morgan I*].  In that case, the defendant, upon hearing police officers enter

the hallway outside of his bedroom, fired several shots through the wall at head level. The defendant subsequently pleaded guilty to drug and firearm offenses. In fashioning his sentence, the district court applied the cross-reference to attempted murder, finding that he "certainly had the ability to form the intent to commit the offense of attempt to murder." *Id.* at 696. But this court reversed and remanded, emphasizing that "the district court's finding that Morgan 'had the ability to form the intent' to kill [was] not the equivalent of finding that he actually formed that intent," and that "the facts as presented do not inevitably lead to a finding of the specific intent to kill." *Id.* at 697.

On remand, the district court unequivocally found "that Morgan possessed the specific intent to kill the police officers who entered his apartment." *United States v. Morgan*, 572 F. App'x 292, 296 (6th Cir. 2014) [hereinafter *Morgan II*]. Rather than reapply the cross-reference, however, the district court took a different procedural tack. It used the finding that Morgan possessed the intent to kill as a ground to vary upward from the Guidelines. When Morgan again appealed his sentence, this court affirmed, noting that the district court had "cured" the deficiency in its original finding as to Morgan's intent to kill. *Id.* at 296.

The district court in the present case, unlike in *Morgan I*, unequivocally found that the defendant possessed the specific intent to commit murder. So *Morgan I* offers Viney no shelter. Moreover, *Morgan II* confirms (albeit in the context of an upward variance rather than a cross-reference) that a set of facts that Viney himself characterizes as similar to his own can lead a court to find that a defendant possessed the intent to kill. *See id.* at 294.

Other Sixth Circuit precedent likewise indicates that intentionally shooting toward a person at close range can support a finding of malice aforethought. In *Milton*, for example, this court upheld the application of the cross-reference where the defendant, "unprovoked, fired at

least two shots into the victim's car" after the victim tried to confront him about the fact that he had sold the victim "chalk instead of cocaine." 27 F.3d at 204–05, 208. This court affirmed the application of the cross-reference, even though it was "disturbed by the district court's failure to make any findings relevant to the elements of second degree murder," because it determined that the facts compelled a finding that the defendant had acted with malice aforethought. *Id.* at 208. Although the facts before us do not necessarily compel such a finding, neither do they preclude it.

Several unpublished Sixth Circuit cases also uphold the application of the cross-reference based on analogous facts. *See, e.g.*, *United States v. Snowden*, 602 F. App'x 294, 296–97 (6th Cir. 2015) (concluding that the cross-reference was appropriate where the defendant screamed at his girlfriend, knocked things over, punched a door, and, after she retreated into the bathroom, shot five times through the bathroom wall while yelling that he was going to kill her); *United States v. Sanders*, 472 F. App'x 376, 381 (6th Cir. 2012) (concluding that the cross-reference was appropriate where the defendant told the victim "I'm going to blow your ass off" and "I told you I was going to kill you" before firing at him twice from ten feet away); *United States v. Montgomery*, 412 F. App'x 856, 858–60 (6th Cir. 2011) (concluding that the cross-reference was appropriate where the defendant, shortly after a quarrel with his girlfriend, stood outside her home and fired multiple shots into her bedroom).

Viney's insistence that he intended only to scare or intimidate Young might raise the question of why he did not actually kill Young if in fact he intended to do so. But an obvious possibility is that Viney simply missed his opportunity, and Young's intervention thwarted the murder. By swiping at the gun and then running, Young significantly complicated Viney's task of shooting him. Young's reaction to having the gun pointed at him, as well as the actions of

Tameka and the other shooter who disastrously returned fire, strongly suggest a shared, contemporaneous perception that Viney possessed the intent to kill.

We cannot know with certainty, of course, how Viney intended the confrontation in the parking lot to end. But his actions—declaring "war" on Young, pursuing him from the hookah lounge into the parking lot in the early-morning hours without provocation, taunting him with fighting words and gestures, drawing a loaded gun, pointing it at Young's face from point-blank range, and shooting in Young's direction as Young took evasive action—plainly reflect a gross deviation from any reasonable standard of care. *See Milton*, 27 F.3d at 208 ("Despite Milton's statement that he only meant to scare Beasley, from his actions we infer that he must have been aware of a risk of death or serious bodily injury."). Accordingly, the district court's finding, by a preponderance of the evidence, that Viney acted with the intent to kill was not clearly erroneous. The application of the cross-reference was therefore appropriate.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.