NOT RECOMMENDED FOR PUBLICATION
File Name: 06a0820n.06
Filed: November 8, 2006

No. 05-1905

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

JUDITH LUSTIG,

      Plaintiff-Appellant,

         v.

M. MONDEAU, Waterford Police Officer;
DOLEHANTY, Waterford Police Officer; BRYAN
JOHNSON, Oakland County Sheriff Deputy; M.
KARCHNICK, Oakland County Sheriff Deputy;
MILT WILLIAMS, Oakland County Sheriff Deputy;
D. MILES, Oakland County Sheriff Deputy; T.
GUERIN, Oakland County Sheriff Deputy;
OAKLAND COUNTY; WATERFORD TOWNSHIP;
JOHN DOE, jointly and severally.

      Defendants-Appellees.

On Appeal from the United
States District Court for the
Eastern District of Michigan

_____/

**Before:**     **GUY, GILMAN, and ROGERS, Circuit Judges.**

      **RALPH B. GUY, JR., Circuit Judge.**     Plaintiff Judith Lustig appeals from the

entry of summary judgment in favor of four of the defendants on qualified immunity grounds

with respect to her § 1983 claims for unlawful seizure, excessive force, and retaliation. 42

U.S.C. § 1983. These claims arose out of the stop of plaintiff's pontoon boat, which led to

her arrest for operating a watercraft while under the influence of liquor and her plea of no

contest to the lesser charge of operating a watercraft while impaired. MICH. COMP. LAWS

ANN. § 324.80176(1) and (3) (1999).

Plaintiff has limited her appeal to the following three claims: (1) that the stop by Oakland County Sheriff Deputies Bryan Johnson and Matthew Karchnick was invalid; (2) that Waterford Police Officer Michael Mondeau used excessive force when he and his partner, Officer William Dolehanty, removed plaintiff from her docked pontoon boat; and (3) that Johnson, Dolehanty, and Mondeau retaliated against her for complaining about being mistreated. For the reasons set forth below, we affirm the judgment in favor of defendants with respect to all of the claims except the excessive-force claim against Officer Mondeau. Because plaintiff has alleged facts that preclude a finding at this stage that he is entitled to qualified immunity on the excessive-force claim, we reverse the decision granting summary judgment to Mondeau on that claim and remand for further proceedings consistent with this opinion.[1]

## I.

The stop leading to plaintiff's arrest occurred at approximately 9:00 p.m. on August 25, 2002, following an afternoon of golf and a reception at which she had two glasses of wine. At about 6:45 p.m., plaintiff and her husband Richard Lustig, a criminal defense attorney, drove to their home on Cass Lake. Plaintiff decided to go out alone on the pontoon boat to visit her sister on the other side of the lake, and left with her puppy and another glass of wine. At 8:30 p.m., after visiting a while, plaintiff started for home in the pontoon boat with an unfinished glass of wine.

---

[1]Plaintiff has abandoned her other claims against these defendants, as well as all claims against Waterford Township, Oakland County, and the other individual defendants.

When plaintiff's boat was approximately 110 yards from home, Deputies Johnson and Karchnick hailed and stopped plaintiff. Plaintiff said she was surprised to see them out so late, and asked the reason for the stop. Plaintiff testified that Johnson said it was because her green navigation light was "out." The deputies' report stated more specifically that the reason for the stop was that the green navigation light was not visible to them because it was being obscured by her illuminated docking lights. According to plaintiff, they engaged in friendly conversation for more than five minutes before Johnson asked her if she had been drinking. Plaintiff admitted both that she had a glass of wine with her and that she had consumed two glasses of wine earlier that evening.

Plaintiff perceived a shift in attitude from "friendly" to "authoritative," and was asked to recite her ABCs. Plaintiff laughed at the request, and Johnson asked if she was refusing to cooperate. Plaintiff began to recite the ABCs correctly, but stopped, started over, and stopped again without finishing. The deputies said they were going to conduct a safety inspection of her boat, even though plaintiff pointed out the sticker showing that it had passed a marine safety inspection two weeks earlier.[2]

Without boarding, the deputies asked plaintiff to turn the navigation and docking lights on and off. The deputies reported that plaintiff required assistance in locating the switch for the docking lights; that the green navigation light was not visible when the

---

[2]Plaintiff argued in the criminal case that because the boat had the sticker, the stop violated Michigan law. However, the Michigan statute actually provides that, except to inspect for the number and adequacy of personal flotation devices, a peace officer may not stop and inspect a vessel bearing such a sticker while it is effective, "*unless that peace officer has probable cause to believe the vessel or the vessel's operator is in violation of a marine law.*" MICH. COMP. LAWS ANN. § 324.80166(7) (1999) (emphasis added).

docking lights were turned off; and that plaintiff's breath smelled of alcohol. When asked again to recite the ABCs, plaintiff refused, became agitated, and told them she wanted to call her husband, who was a defense attorney. Plaintiff admitted that she was yelling at the officers and complaining about their treatment of her. At that point, the deputies decided to tow plaintiff's boat to the state park because they believed she was intoxicated. The deputies called for backup, and plaintiff called her husband.

Waterford Township Police Officers Mondeau and Dolehanty responded to the backup call, arriving at the state park as the pontoon boat was being docked by Johnson and Karchnick. Plaintiff's husband arrived at roughly the same time, followed by a supervising deputy sheriff.[3] According to plaintiff, Mondeau and Dolehanty approached her on the pontoon boat, took her arms, and twisted them behind her. Although Mondeau and Dolehanty testified that it was Johnson who escorted plaintiff from the boat, defendants accept plaintiff's version of the events for purposes of the qualified immunity analysis. The hold used, which is taught in the police academy, is called a compliance control or come-along hold and involves holding the arms behind a person with palms out and elbows bent. Compliance is achieved by lifting the arm, which forces the person forward to alleviate pressure and pain. Plaintiff does not allege that the hold itself, or that Dolehanty's application of the hold to plaintiff, involved the use of constitutionally excessive force. Rather, she restricts this claim to Mondeau's application of the hold.

---

[3]Plaintiff believed that she was met by six Waterford Township police officers, but conceded after discovery that her recollection was probably incorrect. Plaintiff sued two other deputy sheriffs who arrived after plaintiff was placed under arrest, but the claims against them were dismissed by stipulation.

When the officers took her arms, plaintiff balked and asked to be able to shut the gate to keep the puppy on the boat. Mondeau twisted her right arm to force her forward, left the gate open, and said, "Fuck the dog." Plaintiff protested that he was hurting her, to which Mondeau allegedly responded, "Good. I love to manhandle women." Plaintiff began screaming to her husband and Mondeau twisted her right arm harder, lifting it away from her body and forcing her forward. When plaintiff screamed that it hurt, Mondeau would jerk her arm again. Mr. Lustig, who was being kept at bay, testified that he was shouting angrily for plaintiff to "shut up" and for the officers to get their "fucking hands" off his wife. The supervising deputy told the officers to "ease up," and plaintiff was released from the control hold when they reached the nearby parking area.

Additional field sobriety tests were performed, including a preliminary breath test (PBT) that registered a blood alcohol level of .15. Placed under arrest, plaintiff was handcuffed by Mondeau. When she complained that the handcuffs were painfully tight, Mondeau allegedly responded, "I told you I had a reputation for manhandling women." Plaintiff testified that she lost feeling in her fingers during the ride to the jail, but claimed no further injury.[4]

At the Oakland County Jail, Officer Mondeau allegedly asked plaintiff if she would be represented by "Ricky" or "Dovie," referring to her husband and stepson, who were both criminal defense attorneys. The breathalyzer test administered to plaintiff at 10:45 p.m.

---

[4]Although plaintiff relies on several handcuffing cases, she does not articulate a claim for excessive force on that basis. Even if she had, to reach a jury on a claim that tight handcuffing amounted to excessive force, the plaintiff must allege some physical injury from the handcuffing. *Lyons v. Xenia*, 417 F.3d 565, 575-76 (6th Cir. 2005).

registered a blood alcohol level of .16. Plaintiff does not deny that the defendants had probable cause to detain and arrest her for operating a watercraft while under the influence of liquor. That charge was resolved by the no contest plea entered in March 2003.[5]

With respect to the claim of retaliation, plaintiff alleges that Johnson, Dolehanty, and Mondeau purposely used the wrong version of a form to advise plaintiff of her rights and report her arrest to the Michigan Secretary of State's office with the intent to wrongfully interfere with her driving privileges. Defendants concede that Form DI-177W, entitled "Watercraft-Breath, Blood, Urine Test Report, LEIN Input Prompt," should have been used instead of Form DI-177, entitled "Breath, Blood, Urine Test Report, Michigan Temporary Driving Permit." The latter form is also called a "625G" in reference to the statutory authorization for an officer to confiscate an arrestee's driver's license and issue a temporary driving permit for certain motor vehicle offenses. MICH. COMP. LAWS ANN. § 257.625g (1999).

Although the wrong form was used, plaintiff's driver's license was not confiscated. A copy of the form was provided to plaintiff at the time of her arrest, but the error was not corrected before her plea was entered. Plaintiff alleges that the error resulted in a suspension or restriction on her driving record that prevented her from renewing her driver's license the following year. When that happened, Mr. Lustig called the sheriff's department and talked

---

[5]The district court found the deputies had probable cause to arrest based on (1) the presence of alcohol on the boat, (2) her inability to recite the alphabet completely, and (3) her refusal to cooperate with the inspection. Without appealing this finding, plaintiff suggests that probable cause was not established until *after* the PBT test was administered. On the contrary, an arrest may be based in whole or part on the results of a PBT, but PBT testing is not required to establish probable cause. MICH. COMP. LAWS ANN. § 324.80180(2) (1999).

to someone about correcting the error. He was told to "fuck off" since plaintiff already had a lawsuit pending, and was warned that they were watching her. Plaintiff did not drive during the sixty days that it took to straighten the error out with the Secretary of State's office.

This action was commenced in June 2003, three months after the plaintiff entered her no contest plea, and an amended complaint was filed in June 2004. Discovery proceeded, several of the defendants were dismissed by stipulation, and motions for summary judgment were filed by the remaining defendants. After briefing, argument, and post-hearing submissions, the district court granted the defendants' motions for summary judgment on May 9, 2005. Plaintiff sought reconsideration of that order, which was denied on May 25, 2005. This appeal followed.[6]

## II.

The district court's decision granting summary judgment on qualified immunity grounds is reviewed *de novo*. *Smith v. Ameritech*, 129 F.3d 857, 963 (6th Cir. 1997); *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996). Under the doctrine of qualified immunity, "government officials performing discretionary functions [] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

---

[6]The district court's subsequent denial of plaintiff's motion for relief from judgment under Fed. R. Civ. P. 60(b) is not before us because no separate notice of appeal was filed. *Caudill v. Hollan*, 431 F.3d 900, 906 (6th Cir. 2005).

In considering a claim of qualified immunity, courts must address the threshold question of whether the facts, taken in the light most favorable to the plaintiff, demonstrate that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If a violation could be shown, then the next step is to ask whether the right was "clearly established" in a particularized sense, such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202; *see also Brosseau v. Haugen*, 543 U.S. 194 (2004).

## A.     Seizure

Plaintiff challenges the district court's finding that the initial stop was justified by probable cause to believe that a marine code violation had occurred or was occurring. It is clear that a stop based on probable cause to believe a code violation has occurred does not violate the Fourth Amendment, "even if the officer's true motive is to detect more extensive criminal conduct." *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002); *see also Whren v. United States*, 517 U.S. 806, 814 (1996). For probable cause to exist, the facts and circumstances within the officers' knowledge must be sufficient to warrant a man of reasonable caution to believe that an offense had been or was being committed. *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949).

The district court found that Johnson and Karchnick had probable cause to make the stop because they were unable to see plaintiff's navigation lights as required by Michigan law. There is no dispute that the pontoon boat was required, if underway between sunset and sunrise, to be equipped with "a combination 20 point bow light forward, showing green to

starboard and red to port visible 1 mile or in lieu of this requirement may display lights as specified by the international rules of the road." MICH. ADMIN. CODE R. 281.1241 (2002). Plaintiff argues that the district court erred by disregarding evidence that the green navigation light was "in working order" before and after the stop. Specifically, plaintiff presented evidence that the boat had passed a marine safety inspection two weeks earlier and that plaintiff's brother-in-law had checked that the lights were working before she headed for home shortly before her arrest. Plaintiff's husband also testified that the lights were functioning both when he drove the boat home after the arrest and several weeks later.

While this evidence could lead one to infer that the green light was also operational at the time of the stop, the articulated reason for the stop was that the deputies could not *see* the navigation lights because the docking lights were on. Plaintiff insinuates that the deputies were lying about this, but no evidence was presented to refute the articulated reason for the stop. Plaintiff did not deny that the docking lights were on, did not offer any evidence to show that the navigation lights would be visible even if the docking lights were on, and did not dispute that operating a watercraft without visible navigation lights would violate Michigan law. Plaintiff's testimony also indicates that the inspection specifically involved testing of the navigation and docking lights. The evidence permits only one conclusion—that the deputies had probable cause to believe that a marine violation had occurred. Therefore, the stop did not violate the Fourth Amendment and Deputies Johnson and Karchnick were entitled to qualified immunity with respect to this claim.[7]

---

[7]Without elaboration, plaintiff also asserts that even if the initial stop was valid, the deputies impermissibly extended the stop with friendly conversation that led to the questions about whether plaintiff

## B.       Excessive Force

Plaintiff has abandoned her claims based on excessive force, or the failure to intervene in the use of force, except as against Officer Mondeau.  The district court, accepting the plaintiff's version of the encounter, found that plaintiff could not demonstrate either that Mondeau had used excessive force or that a reasonable officer would have known that his conduct would violate the Fourth Amendment.

For excessive force claims brought under § 1983, the appropriate standard is determined by identifying the specific constitutional right infringed by the challenged application of force.  *Graham v. Connor*, 490 U.S. 386, 393-94 (1989).  "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]"  *Id*. at 395.  Since the challenged use of force allegedly occurred in detaining plaintiff on the belief that she was operating the boat while intoxicated, the reasonableness standard applies.

An officer's "right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Id*. at 396. Of course, "even where some force is justified, the amount actually used may be excessive." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).  The reasonableness inquiry is an objective one, which depends on the facts of each case judged from the perspective of a

---

had been drinking.  Because the purpose of the stop had not been completed, the detention did not exceed the scope of the stop.  *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995) (Once the purpose of a traffic stop is completed, the officer may not continue the detention "unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.").

reasonable officer on the scene and not with the benefit of 20/20 hindsight. *Graham* at 395-96. We must consider "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. Although not an exhaustive list, the relevant considerations include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396.[8]

Not one of these considerations supports a conclusion that the amount of forced used by Mondeau was reasonable under the circumstances. Mondeau and his partner Dolehanty were called to the scene to assist in plaintiff's further detention. The crime at issue—operating a watercraft while intoxicated—was not a severe offense that would support a greater use of force. Moreover, no one has suggested that plaintiff or her small puppy posed an immediate threat to the safety of the assembled group of officers or to others. Plaintiff's offense did not involve a crime of violence, she was not thought to be armed, and even her loud complaints did not involve threats to the safety of the officers. Finally, plaintiff did not fight the officers or attempt to flee, but offered at most passive resistance to being escorted off the pontoon boat while she and her husband were yelling at each other and at the officers.

---

[8]Plaintiff repeatedly emphasizes the harsh and offensive statements attributed to Mondeau regarding the puppy and about liking to "manhandle" women. However, because the Fourth Amendment's reasonableness inquiry is an objective one, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham*, 490 U.S. at 397.

Due to her apparent and undisputed intoxication, a reasonable officer might well have decided to physically escort plaintiff from the boat and away from the dock using a control hold, as Officer Dolehanty is alleged to have done. It is the additional force Mondeau is alleged to have used in twisting and jerking her arm in response to her complaints and cries of pain that may establish a claim for excessive force.

Plaintiff contends that Mondeau twisted and jerked her right arm, causing pain and permanent injury. By all accounts, plaintiff loudly protested at the time that he was hurting her. Yet, she did not complain of injury at the jail or seek medical attention until a month later when she reported to the emergency room with severe pain in her right arm and shoulder. Plaintiff explained in an affidavit that her right shoulder had bothered her some during the first two weeks after her arrest, worsened over the following two weeks, and became extremely painful shortly before she was seen in the emergency room. The evidence shows plaintiff underwent surgery to remove an extra cervical rib that doctors thought was impinging on an artery, but she continued to experience pain and loss of function. Whether plaintiff's physical problems can ultimately be traced to the use of force by Mondeau is a matter reasonably in dispute.[9] This court has held that except for excessive force handcuffing cases, excessive force claims do not require allegations of physical injury. *Ingram v. City of Columbus*, 185 F.3d 579, 597 (6th Cir. 1999). Nonetheless, evidence of injury resulting from the use of force, including latent injury, may be relevant to the question of whether the

---

[9]Even the one medical opinion quoted by plaintiff on appeal stated that the doctor could not comment with any convincing authority on the claim that the plaintiff's initial symptoms were precipitated by the alleged altercation.

force used was excessive. *Martin v. Heideman*, 106 F.3d 1308, 1311-12 (6th Cir. 1997).

Finally, plaintiff testified specifically that Mondeau twisted her right arm behind her in a manner that forced it to move "like it should not."[10] The district court found plaintiff's testimony about how high her arm had been lifted was confusing and, before examining her husband's account, added that her testimony was on the whole inconsistent, unreliable, and insufficient to create an inference that excessive force was used. This credibility determination, however, was inappropriate at the summary judgment stage where all inferences must be drawn in the plaintiff's favor. As the district court went on to note, it was plaintiff's husband who provided the clearest testimony about Mondeau's alleged used of force. Mr. Lustig testified at one point that plaintiff's arms were lifted up behind her at an angle of 75 to 90 degrees and held no more than a foot away from her body. From there, Mondeau lifted her right arm shoulder-blade high, which forced plaintiff to bend forward to less than a 45 degree angle. Mr. Lustig believed that if she had not leaned forward, her arm would have been pulled out of its socket. Mondeau raised plaintiff's arm up high, and then repeatedly jerked her arm higher in response to her yelling and protesting.

In other words, plaintiff has alleged that Mondeau repeatedly and gratuitously applied additional force, which inflicted pain and may or may not have resulted in permanent injury, against an individual who posed no threat to safety, did not attempt to flee, offered at most passive resistance to the officers, and was already under the officers' physical control.

---

[10]Defendants relied on photographs taken during plaintiff's deposition of her attempt to demonstrate how her arm was twisted. They are of little value, however, because plaintiff was holding her own arm behind her back.

Accepting plaintiff's version of the encounter, as we must for purposes of qualified immunity, we find that plaintiff could demonstrate that the amount of force used by Mondeau was objectively unreasonable under the circumstances. *See*, *e.g.*, *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994) (continued spraying of mace on incapacitated suspect); *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001) (driving recklessly with plaintiff handcuffed in back seat so as to cause further pain and injury); *Minchella v. Bauman*, 72 Fed. App'x 405 (6th Cir. 2003) (unpublished decision) (twisting arms, slamming into car, and kicking ankle in process of arrest for assault by throwing driver's license and registration at an officer).

Turning to the second step in the qualified immunity analysis, the question is whether the right to be free from excessive force under these circumstances was clearly established such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. The right must be clearly established at the time either under a body of materially similar case law, or because the violation is sufficiently obvious under general constitutional standards. *Brosseau*, 543 U.S. at 199. Existing law made clear that an officer may not gratuitously use force to inflict pain on an already neutralized or incapacitated suspect. *See*, *e.g.*, *Adams*, 31 F.3d at 387; *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002) (continuing to beat "neutralized" detainee); *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988) (totally gratuitous blow to the ribs of a handcuffed suspect who was not trying to escape). Also, it is sufficiently obvious under *Graham* that it would be objectively unreasonable for an officer to gratuitously cause

additional pain to a nonviolent and, at most, passively resistant detainee while she is being restrained in a full control hold by two officers. *See Smith v. Cupp*, 430 F.3d 766, 777 (6th Cir. 2005) ("where a general constitutional rule applies with 'obvious clarity' to a particular case, factually similar decisional law is not required to defeat a claim of qualified immunity"). Thus, the district court erred in finding Mondeau was entitled to qualified immunity on the excessive force claim.

## C.      Retaliation

To establish a *prima facie* case of retaliation under § 1983, plaintiff must demonstrate (1) that she was engaged in constitutionally protected conduct; (2) that the defendant took adverse action against her that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) that the adverse action was motivated at least in part by the plaintiff's protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999); *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998). The district court found that plaintiff could not establish any of these elements, and granted summary judgment to the defendants.

The plaintiff's claim is that the defendants purposely used the wrong form, and refused to assist in correcting the error a year later, in order to retaliate against plaintiff for having engaged in "classic First Amendment activities–complaining to and about authorities about mistreatment and abuse of power." Although this claim is not clearly identified in the district court, plaintiff alleges that she engaged in protected speech by threatening, complaining, and protesting her treatment during the stop and detention that preceded her arrest. In fact, plaintiff states that, if the defendants are to be believed, she threatened that

her "big-wig" attorney-husband would have their jobs, complained loudly about the stop, and yelled and protested as she was escorted to the parking area.

There is no dispute that the wrong form was in fact used. Johnson signed the form, Dolehanty was listed on it as having administered the breathalyzer, and Mondeau was at the jail during the booking process. We agree with the district court that this claim fails because the evidence indicates that the wrong form was used by mistake, in essence inadvertently and not intentionally, and therefore the error could not have been for the purpose of retaliation.

Two similar forms are used for alcohol-related offenses depending on whether the offense involved a watercraft or a motor vehicle. The form appropriate to motor vehicle offenses plainly stated that it served as a temporary driving permit for an arrestee whose driver's license had been confiscated. However, plaintiff's license was not confiscated and she experienced no interference with her driving privileges until it came time to renew the following year. Moreover, plaintiff was given a copy at the time of her arrest and her attorneys were aware of the error during the criminal proceedings. It is not sufficient that plaintiff believes the wrong form was used purposefully and in retaliation for having complained and protested about her treatment during the stop and detention. There was no evidence that the error was intentional, rather than inadvertent, or that it was motivated even in part by plaintiff's speech.

Finally, plaintiff alleges that the failure to correct the error the following year was also retaliation for her First Amendment speech. The evidence was that Mr. Lustig was rudely rebuffed when he sought help from the sheriff's department to correct the error the following

year.  As the district court found, however, plaintiff failed to allege that any of the remaining defendants were involved in Mr. Lustig's efforts to get the error corrected.  Because plaintiff cannot demonstrate that these defendants were personally involved in the later incident of alleged retaliation, summary judgment was properly entered on this claim.

The judgment in favor of defendants is **AFFIRMED** in part and **REVERSED** in part, and the case is **REMANDED** for further proceedings consistent with this opinion on the claim of excessive force against Mondeau.

**RONALD LEE GILMAN, Circuit Judge, concurring**. I fully concur in both the reasoning and the result reached by the lead opinion. My purpose in writing separately is simply to point out that, in my opinion, Officer Mondeau's alleged statements to the effect that he "loved to manhandle women" are of greater significance in this case than the footnote mention to which they are relegated. Lead Op. at 11 n.8. Mondeau's statements are not just after-the-fact characterizations, but rather provide a contemporaneous account of the force that he intended to exert in Lustig's arrest. By his own alleged description, Mondeau did not simply escort Lustig by placing her in a control hold; he instead "manhandl[ed]" her.

Mondeau's alleged statements thus bear on the excessive-force determination in this case and lend further support to the lead opinion's conclusion in step one of its analysis that Mondeau's alleged use of force was excessive. I believe the statements also factor into the second step of the lead opinion's analysis in determining whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Lead Op. at 14 (citation and quotation marks omitted). Again, Mondeau's own alleged contemporaneous statements to the effect that he was "manhandl[ing]" Lustig support the inference that he was or should have been aware that such conduct was unlawful.