RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0146p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

DAWN HUGHEY,

                *Plaintiff-Appellant*,

  *v.*

ANTHONY EASLICK,

                *Defendant-Appellee*.

No. 20-1804

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:19-cv-10368—Judith E. Levy, District Judge.

Argued: April 27, 2021

Decided and Filed: June 28, 2021

Before: MOORE, COLE, and GILMAN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Gina U. Puzzuoli, ROMANO LAW PLLC, Pleasant Ridge, Michigan, for Appellant. Daniel Hude, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Gina U. Puzzuoli, Daniel G. Romano, Richard A. Moore, ROMANO LAW PLLC, Pleasant Ridge, Michigan, for Appellant. Andrew J. Jurgensen, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge. Dawn Hughey's 42 U.S.C. § 1983 suit arises from a handcuffing during a traffic stop. Hughey alleges that Michigan State Trooper

Anthony Easlick yanked her left arm as he handcuffed her, that he ignored her complaints about pain in her left arm, and that the cuffs were overly tight. Hughey purportedly sustained a torn rotator cuff and ring marks around her wrists. Finding that Easlick is entitled to qualified immunity, the district court granted summary judgment to the trooper on Hughey's excessive-force claim. Because Hughey has created a genuine dispute of material fact about whether Easlick violated her clearly established constitutional right to be free from excessive force, we **REVERSE** and **REMAND** for further proceedings.

## I. BACKGROUND

One day, Dawn Hughey was late to work. R. 1 (Compl. at 3) (Page ID #3). She hurtled down the highway—14 mph over the 70-mph speed limit—to her job at Goodwill. R. 21-3 (Hughey Dep. at 20) (Page ID #176); R. 21-2 (Easlick Dep. at 23) (Page ID #160). She zoomed by Michigan State Trooper Anthony Easlick, who flipped on his dashcam, pulled Hughey over, and strode over to her car. R. 21-3 (Hughey Dep. at 20) (Page ID #176); R. 21-2 (Easlick Dep. at 23) (Page ID #160); Dashcam 00:01–00:46.[1]

The next fourteen minutes are undisputed. Easlick discovered that Hughey's car was uninsured and unregistered and that there was an outstanding warrant for Hughey's failure to appear in court for a traffic violation. R. 21-2 (Easlick Dep. at 28–9) (Page ID #161–62). Easlick relayed that Hughey needed to pay the $400 bond on her warrant in cash immediately or he would have to take her to the courthouse to sort out the warrant. R. 21-3 (Hughey Dep. at 22) (Page ID #177); R. 21-2 (Easlick Dep. at 31–32) (Page ID #162); Dashcam 13:46–14:09. Hughey, unsurprisingly, did not have hundreds of dollars of cash in her possession. R. 21-3 (Hughey Dep. at 23) (Page ID #177). Crying, Hughey emerged from her car; she did not resist arrest. *Id.* at 24–25 (Page ID #177); R. 21-2 (Easlick Dep. at 34) (Page ID #163); Dashcam at 14:40–15:04.

The broad strokes of what followed are likewise uncontested. Easlick handcuffed Hughey's hands behind her back, walked her to his car, and placed her in the front passenger

---

[1]At this point, the dashcam's microphone flipped on. Dashcam 00:58–01:08.

seat. R. 21-3 (Hughey Dep. at 25) (Page ID #177); R. 21-2 (Easlick Dep. at 35) (Page ID #163). Ten minutes later, a tow truck—which Easlick had summoned—hauled Hughey's car away. R. 21-2 (Easlick Dep. at 44) (Page ID #165). Easlick switched off the dashcam's microphone. *Id.* at 42–43 (Page ID #165). Sometime after the tow truck arrived, Hughey expressed suicidal thoughts, so Easlick took her to the hospital for a psychiatric evaluation. R. 21-3 (Hughey Dep. at 32) (Page ID #179); R. 21-2 (Easlick Dep. at 37–39) (Page ID #164). Easlick removed the handcuffs there. R. 21-3 (Hughey Dep. at 36) (Page ID #180); R. 21-2 (Easlick Dep. at 45–46) (Page ID #166).

The parties dispute three key points: the nature of the handcuffing, Hughey's and Easlick's exchanges over Hughey's purported arm pain, and what occurred at the hospital. First, Hughey alleges that Easlick twisted her left arm behind her back as he handcuffed her and did not check the tightness of the handcuffs. R. 21-3 (Hughey Dep. at 25–27) (Page ID #177–78). Easlick asserts, however, that he did not twist Hughey's arm and insists that he did place a finger between the cuffs and Hughey's wrists to check the cuffs' tightness. R. 21-2 (Easlick Dep. at 34–35) (Page ID #163).

Second, Hughey claims that her left shoulder began to hurt "[a]lmost immediately" after Easlick placed her in the passenger seat. R. 21-3 (Hughey Dep. at 28–29) (Page ID #178). She recalls that she told Easlick four or five times while she was in his car that her shoulder hurt. *Id.* at 27–28 (Page ID #178). She swears that Easlick said "nothing" in response to her complaints and never checked whether the cuffs were too tight. *Id.* Easlick, on the other hand, has shifted his stance about whether and when Hughey complained of her shoulder injury. In his incident report, Easlick wrote: "Hughey complained of pain in her left arm and I double checked the tension of the handcuffs." R. 16-2 (Police Rep. at 1) (Page ID #83). At his deposition, Easlick initially could not recall whether Hughey had told him that her shoulder hurt. R. 21-2 (Easlick Dep. at 39) (Page ID #164). Easlick remembered only that ten to fifteen minutes after he placed Hughey in the passenger seat and after Hughey expressed suicidal ideation, Hughey asked him when he was going to remove her handcuffs. *Id.* Easlick stated that he told Hughey that he would remove her cuffs at the hospital. *Id.* Easlick later clarified that Hughey might have implied that her handcuffs were too tight when she asked him when he was going to remove the

cuffs.  *Id.* at 40 (Page ID #164).  After refreshing his memory with his incident report, however, Easlick recalled that Hughey told him that her left arm hurt as she was getting into his car.  *Id.* at 55–56 (Page ID #168).

Third, Hughey attested that after Easlick took off the handcuffs at the hospital, a nurse observed that Hughey had "rings around [Hughey's] wrists where the cuffs were on too tight and [Easlick told the nurse] that's from the cuffs."  R. 21-3 (Hughey Dep. at 36) (Page ID #180).  Easlick does not recall this interaction.  R. 21-2 (Easlick Dep. at 46–47) (Page ID #166).

What does the dashcam footage portray of the contested events?[2]  In short:  very little.  When Hughey gets out of her car, Easlick has his back to the dashcam and is standing almost entirely off-camera.  Dashcam 15:01–15:03.  Hughey steps in front of Easlick.  *Id.*  Easlick apparently handcuffs Hughey, which takes fifty-three seconds.  *Id.* 15:03–15:56.  Easlick is located between Hughey and the dashcam, and both persons are predominantly off-screen.  *Id.*  So no part of the handcuffing is visible in the footage—only Hughey's right elbow can be seen.  *Id.*[3]  Easlick puts his left hand on Hughey's hands, which are now handcuffed behind her back, and walks her to the passenger side of his car.  *Id.* 15:36–16:04.  Both persons walk off camera.  *Id.* 16:04.  Easlick presumably places Hughey in the front passenger seat.  *Id.* 16:04–16:12.  Clicking noises indicate that Easlick is opening the passenger-side door and buckling Hughey into the front-passenger seat.  *Id.*  The two imperceptibly talk for twenty-four seconds.  *Id.* 16:12–16:36.  Easlick walks over to Hughey's car's driver's side, removes something from inside her car, treads back to his own car's driver side, and strolls off-camera.  *Id.* 16:36–17:04.  More clicking noises presumably indicate that Easlick is opening his driver-side door and getting into the driver's seat.  *Id.* 17:12.  Hughey and Easlick chat for nearly ten minutes before Easlick switches the microphone off.  *Id.* 17:18–26:52.  The microphone picks up a lot of their in-car

---

[2]Dashcam footage should be watched with judicious eyes.  *See* Jeffrey Bellin & Shevarma Pemberton, *Policing the Admissibility of Body Camera Evidence*, 87 FORDHAM L. REV. 1425, 1427 (2019).

[3]Hughey and Easlick spoke during the handcuffing.  Dashcam 15:03–15:56.  Everything that Hughey says is inaudible.  *Id.*  At some point, Easlick says to Hughey:  "I'll grab your wallet but we're not going to take [inaudible]."  *Id.* 15:32–36.

conversation,[4] but much of their discussion is inaudible. *Id.* The tow truck arrives three minutes after the microphone is switched off, and the video ends. *Id.* 30:40.

Hughey sued Easlick for excessive force and deliberate indifference under 42 U.S.C. § 1983.[5] Easlick moved for summary judgment, contending that qualified immunity shielded his actions. Easlick moved to exclude from trial evidence of his disciplinary history, which Hughey contested. The district court granted summary judgment to Easlick for Hughey's excessive-force and deliberate-indifference claims and denied Easlick's motion in limine as moot. *See Hughey v. Easlick*, No. 19-10368, 2020 WL 4200965, at *6 (E.D. Mich. July 22, 2020). Hughey appealed only the district court's granting Easlick summary judgment on Hughey's excessive-force claim. *See* Appellant's Br. at vi.

## II. ANALYSIS

### A. The Qualified-Immunity Test

A government official is not entitled to qualified immunity if the official's conduct violated a constitutional right and that right was "clearly established" such that "it would be clear to a reasonable officer that [their] conduct was unlawful in the situation [they] confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "Once a plaintiff demonstrates a genuine dispute of material fact as to whether there has been a constitutional violation, by making out a claim of excessively forceful handcuffing sufficient to survive summary judgment, weighing the evidence and determining whether an officer should be liable are tasks exclusively for the jury." *Baynes v. Cleland*, 799 F.3d 600, 615 (6th Cir. 2015).

---

[4]The microphone captures Hughey's saying that she was unaware of the outstanding warrant and that she was going to lose her job, Hughey's crying, Easlick's calling the tow truck, Hughey's telling Easlick that she has no contraband in her car, Easlick's offering to call Hughey's workplace, Hughey's asking if she would be allowed to retrieve items from her car, and Hughey's discussing her employment history. Dashcam 17:18–26:52.

[5]Hughey's complaint lists three vague claims under the Fourteenth Amendment. R. 1 (Compl. at 4–9) (Page ID #4–9). The parties do not contest, however, that Hughey's complaint sets forth an excessive-force claim under the Fourth Amendment and a deliberate-indifference claim under the Fourteenth Amendment.

**B.  Constitutional Violation**

**1.  Frameworks**

The Fourth Amendment guarantees the right to be free from excessive force to persons who are stopped, arrested, or held in custody by an arresting officer.  *See Graham v. Connor*, 490 U.S. 386, 394–95 (1989); *Phelps v. Coy*, 286 F.3d 295, 300 (6th Cir. 2002).  Two frameworks—the general Fourth Amendment excessive-force inquiry and a test specific to handcuffing claims—are relevant to Hughey's case.

When reviewing Fourth Amendment excessive-force claims, courts invoke an objective-reasonableness standard, *see Graham*, 490 U.S. at 388, which is a fact-specific, totality-of-the-circumstances inquiry, *see Baynes*, 799 F.3d at 607.  To determine whether an arresting officer acted reasonably, we consider a nonexhaustive set of three factors:  "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* (quoting *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001)); *see also Lustig v. Mondeau*, 211 F. App'x 364, 370 (6th Cir. 2006) (quoting *Graham*, 490 U.S. at 396).

We have also articulated a three-part test for ascertaining whether "unduly tight or excessively forceful handcuffing" constitutes excessive force.  *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009).  At the summary-judgment stage, a plaintiff must create a genuine dispute of material fact that "(1) [they] complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing."  *Id.*  Conceptually, the handcuffing test is a subset of the general Fourth Amendment excessive-force framework.  *See Martin v. Heideman*, 106 F.3d 1308, 1313 (6th Cir. 1997) (explaining that we "ha[ve] chosen to view an 'excessively forceful handcuffing' claim under the general excessive force rubric").

We distill from our precedent the relationship between these tests in § 1983 cases involving handcuffing.  *See McGrew v. Duncan*, 937 F.3d 664, 668 (6th Cir. 2019); *Courtright v. City of Battle Creek*, 839 F.3d 513, 518–20 (6th Cir. 2016); *Baynes*, 799 F.3d at 607–08.  We apply the three-prong handcuffing test to one specific act:  a law-enforcement official's allegedly

placing too-tight handcuffs on a person's wrists. If a plaintiff creates a genuine dispute of material fact that they complained that their handcuffs were too tight, the officer ignored those complaints, and the plaintiff experienced "some physical injury" from the physical contact between cuffs and wrists, summary judgment is unwarranted. If a plaintiff's sole allegation is that the cuffs around their wrists were too tight, we need apply only the handcuffing test and our analysis terminates there. But if a plaintiff alleges that excessive force otherwise occurred—even if related to the handcuffing process—we apply the general Fourth Amendment framework to all allegations underlying the excessive-force claim. If the plaintiff creates a genuine dispute of material fact about whether the officer acted unreasonably, summary judgment is likewise inappropriate.

Thus, in Hughey's case, we first apply the handcuffing test to her allegation that Easlick placed overly tight cuffs around her wrists. We then administer the general excessive-force framework to all the alleged events that sustain Hughey's excessive-force claim, including what transpired before, during, and after the handcuffing.

## 2. Handcuffing Test

We first consider whether Hughey complained that her handcuffs were too tight, whether Easlick ignored her complaints, and whether Hughey experienced "some physical injury" from the too-tight handcuffs. Taking the depositions and the dashcam footage together, we conclude that the first two elements of the three-part handcuffing test are satisfied. Easlick recalls that Hughey asked him when he was going to remove her handcuffs, which Easlick conceded was an implication that the cuffs were too tight. R. 21-2 (Easlick Dep. at 39) (Page ID #164); *cf. Baynes*, 799 F.3d at 608 (determining that the first element of the handcuffing test was satisfied when plaintiff complained of the handcuffs' tightness during the ride to jail). Easlick also admits that he told Hughey that he would remove the cuffs once they arrived at the hospital.

*See Baynes*, 799 F.3d at 609 ("[A] plaintiff can survive summary judgment even if the officer gave some reply to plaintiff's complaint if the response was essentially non-responsive.").**[6]**

We home in on the third element—whether "some injury" resulted from the physical contact between cuffs and wrists. Our abundant caselaw on this subject establishes that satisfying the "injury" prong is not demanding. *See, e.g.*, *Courtright*, 839 F.3d at 519; *Morrison*, 583 F.3d at 404; *McGrew*, 937 F.3d at 668. We held in *Courtright*, for instance, that allegations of "pain" due to handcuffing were enough to survive the motion-to-dismiss stage. 839 F.3d at 518–20. And in *Morrison*, we concluded, at summary judgment, that "allegations of bruising and wrist marks create a genuine issue of material fact with regard to the injury prong." *Morrison*, 583 F.3d at 403; *see also McGrew*, 937 F.3d at 668 (reaffirming *Morrison* and holding that "bruising is enough"); *Burchett v. Kiefer*, 310 F.3d 937, 945 (6th Cir. 2002) ("[A]pplying handcuffs so tightly that the detainee's hands become numb and turn blue certainly raises concerns of excessive force.").

Here, Hughey attested in her deposition that she had asked Easlick to remove the handcuffs, which indicates that she was suffering from some degree of pain. She further attested that a nurse observed ring marks around Hughey's wrists and that Easlick told the nurse that the cuffs caused the marks. We conclude that Hughey's deposition testimony creates a genuine dispute of material fact about injury—namely, that the handcuffs caused her pain and were tight enough to leave lingering ring marks that caught the attention of a medical professional.

We respectfully disagree with the district court's decision that Hughey "cannot show a constitutional violation on her wrist-marks claim." *Hughey*, 2020 WL 4200965, at *3. Consider *Martin*, one of our too-tight-handcuffing precedential bedrocks. Martin asserted that his "hands were numb and swelling" because of too-tight handcuffing. *Martin*, 106 F.3d at 1310. "[N]otwithstanding the absence of evidence that Martin continued to suffer numbness and swelling after the handcuffs were removed, or otherwise incurred injury," we concluded that he had created a genuine dispute of material fact about excessive force. *Morrison*, 583 F.3d at 402

---

**[6]**That Easlick swore that he checked the tightness of the handcuffs is inapposite at the summary-judgment stage because Hughey, the nonmoving party, testified that Easlick did not check the cuffs. *See Morrison*, 583 F.3d at 402.

(describing *Martin*).   Martin suffered no bruising, and the court did not even comment on whether his injuries lasted after release from the handcuffs.   Yet we still determined that Martin survived summary judgment.   *Courtright* further proves our point.   Courtright alleged that he "repeatedly complained of pain after he was handcuffed," *Courtright*, 839 F.3d at 517, but did not allege any visible injury—bruising, marks, numbness, swelling, or otherwise, *see id.*   We still concluded that Courtright's "admittingly sparse" allegations of pain were enough to survive the motion-to-dismiss stage.

Because lingering ring marks are of the same ilk as bruising, swelling, and numbness—each indicative of an overly tight cuff that grates on one's skin and causes pain—Hughey's allegations that the handcuffs caused her pain and marked her wrists get her over the genuine-dispute-of-material-fact line.   Not all marks are alike, and a factfinder—not an appellate court at the summary-judgment stage—should decide whether a cuff ring resembles a bruise, *cf. Morrison*, 583 F.3d at 403; *McGrew*, 937 F.3d at 668, or a mere watchband impression.

An exchange during Hughey's deposition merits consideration.   When asked "[d]id you have any wrist injuries because of the handcuffs[,]" Hughey responded "[n]o."   R. 21-3 (Hughey Dep. at 28) (Page ID #178).   At the summary-judgment stage, however, this statement does not preclude a genuine dispute of material fact.   A layperson like Hughey is likely unfamiliar with the complicated caselaw governing excessive-force handcuffing claims.   She may have answered "no" because she did not equate wrist marks from handcuffs with an "injury"; the word "injury" to her might have invoked a more painful experience, such as a fracture.   At bottom, Hughey testified that she complained to Easlick about the tightness of the handcuffs, that the handcuffs left rings on her wrists, that a nurse saw these marks, and that Easlick acknowledged that the cuffs caused the marks—all of this being enough to satisfy the handcuffing test's third element at the summary-judgment stage.

### 3.  General Framework

We now consider whether Easlick's other alleged actions before, during, and after he placed handcuffs on Hughey's wrists were objectively reasonable.   Specifically, we contemplate whether it was objectively reasonable for Easlick to yank Hughey's arm during her arrest and for

him to refuse to loosen or remove Hughey's cuffs after she complained of shoulder pain. We are, of course, mindful that "[l]aw enforcement officers are inevitably required to make difficult, split-second decisions regarding the amount of force needed in a particular situation, and '[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'" *Kostrzewa*, 247 F.3d at 639 (alteration in original) (quoting *Graham*, 490 U.S. at 396–97); *see, e.g.*, *Burchett*, 310 F.3d at 944 ("Burchett's own statements indicate that the initial force used to restrain him may have been necessary. Burchett acknowledged that he 'twisted and turned some' when they tried to handcuff him and that the officers had difficulty restraining him." (citation omitted)).

Still, none of the three nonexhaustive general-framework factors justify Easlick's allegedly yanking Hughey's arm or Easlick's purported refusal to remove the handcuffs after Hughey complained of shoulder pain. Easlick pulled Hughey over for speeding, Easlick arrested Hughey for an outstanding warrant related to a traffic violation, and Hughey did not resist arrest. Put another way, Hughey's minor crimes were far from severe, she posed no immediate threat to Easlick, and she resisted arrest in no way. *See Kostrzewa*, 247 F.3d at 639. An officer's decision to handcuff an arrestee who is accused of committing a nonviolent misdemeanor might be objectively reasonable. *See id.* at 640. But Hughey has alleged far "more than the mere application of handcuffs that were tight." *Id.* She has testified that Easlick tore her rotator cuff as he yanked her arm and that she complained four to five times that her arm hurt. And, again, Easlick concedes that Hughey complained that her shoulder hurt when she entered his police car and that he told her that he would not remove the handcuffs until they arrived at the hospital. *Cf. Burchett*, 310 F.3d at 945 (granting summary judgment to police officers when officers left plaintiff tightly handcuffed for three hours because plaintiff did not initially complain about the handcuffs and because officers responded promptly when plaintiff eventually complained); *Lyons v. City of Xenia*, 417 F.3d 565, 576 (6th Cir. 2005) ("[C]ritically, she does not allege that her physical complaints to the officers went unheeded. To the contrary, she does not even claim that she told the officers that the handcuffs were too tight.").

The district court improperly relied on the dashcam footage in finding that there was no genuine dispute of material fact about whether Easlick used excessive force. Acknowledging

that Easlick and Hughey are standing off-camera in the dashcam footage during the handcuffing, the district court nonetheless reasoned that the dashcam footage does not depict "gratuitous violence" towards Hughey. *Hughey*, 2020 WL 4200965, at *4 (quoting *Morrison*, 583 F.3d at 407). The district court's error was threefold. First, Hughey's entire body save her right elbow is obscured in the dashcam footage. Because the handcuffing is not visible, we cannot discern whether *any* violence occurred—gratuitous or not. Second, the district court incorrectly suggested that violence is a constitutional bright line and ignored that "an excessive use of force claim *may* be established through evidence of severe injury or physical contact, [but we have] not required that this *must* be the case." *Morrison*, 583 F.3d at 407. Third, Hughey's assertion that Easlick vigorously yanked her arm *is* "gratuitous violence" under our precedent. We have decided that a police officer's slapping a handcuffed plaintiff in the face constituted "[g]ratuitous violence" "notwithstanding the relatively minimal use of force applied and the absence of any resulting injury." *Id.* (analyzing the facts and holding in *Pigram ex rel. Pigram v. Chaudoin*, 199 F. App'x 509 (6th Cir. 2006)). Surely a shoulder-yank that tears a rotator cuff is more unwarranted than a face-slap that "antagoniz[es] or humiliat[es] the suspect" without resulting in physical injury. *Id.* (quoting *Pigram*, 199 F. App'x at 513).

So too did the district court err in relying on the dashcam's audio in granting summary judgment. The district court emphasized that "the audio recording for ten minutes after the handcuffing does not reveal any complaints from [Hughey] regarding the handcuffing or her arm and shoulder." *Hughey*, 2020 WL 4200965, at *4. We respectfully disagree. Again, the audio picks up that Hughey and Easlick are speaking for twenty-four seconds when Easlick puts her in the passenger seat. Dashcam 16:12–16:36. But their statements are completely inaudible. *Id.* We consider it more than plausible that this was the moment when Hughey first complained to Easlick about her arm pain—especially because Easlick *conceded* in his deposition that Hughey told him that her arm hurt the moment that she stepped into his car. The audio for the next ten minutes, moreover, is partially imperceptible. Easlick also turned off the audio two minutes before the tow truck arrived, so the remainder of the duo's conversation in the car is not captured. We thus conclude that the dashcam audio does not foreclose the possibility that Hughey repeatedly complained to Easlick about pain in her left arm.

Easlick urges us to grant him summary judgment based on his medical expert's report, which asserts that Hughey's injury could not have been caused by someone twisting her arm as she alleges. R. 16-8 (Matlen Rep. at 10) (Page ID #124). But, unlike the handcuffing test, general excessive-force claims do not require allegations of physical injury. *See Lustig*, 211 F. App'x at 370; *see also Ingram v. City of Columbus*, 185 F.3d 579, 597 (6th Cir. 1999). Here, our analysis hinges on the reasonableness of, not the injury caused by, the arm-twisting. *See Lustig*, 211 F. App'x at 370; *Ingram*, 185 F.3d at 597. To the extent that Easlick submits the medical expert's report as evidence that he never yanked Hughey's arm or to argue that Hughey's lack of injury is relevant to the question of whether his use of force was excessive, *cf. Martin*, 106 F.3d at 1311–12, we still cannot grant summary judgment because of countervailing evidence in the record. Hughey has submitted a "surgical report" that indicates that Hughey "had been seen" for her complaints about her shoulder and that an MRI showed that she sustained a shoulder injury that required surgery. R. 21-4 (Surgical Rep. at 1) (Page ID #188). This surgical report is enough for Hughey to survive summary judgment. *See Baynes*, 799 F.3d at 609.

## C. Clearly Established

The "clearly established" prong of the qualified-immunity test requires us to ask "whether the state of the law [at the time of the action giving rise to the claim] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Baynes*, 799 F.3d at 610 (alterations in original) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). "[G]eneralizations and abstract propositions are insufficient to establish the law clearly[,]" but "the precise factual scenario need not have been found unconstitutional for it to be sufficiently clear to a reasonable official that his actions violate a constitutional right—that is, for the right to be 'clearly established[,]'" *id.* at 612, 611 (quoting *Hope*, 536 U.S. at 739).

No doubt, when we view the facts in the light favoring Hughey, as we must on summary judgment, Easlick violated Hughey's clearly established rights. We have held that the right to be free from too-tight handcuffing had been "clearly established" by 1991. *Martin*, 106 F.3d at 1312–13 (describing *Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993)). As we pointed out in *McGrew*, we clearly established that handcuffing that results in wrist marks is unconstitutional no later than 2009, when we issued *Morrison*. *McGrew*, 937 F.3d at 668. At

bottom, "this Court [has] directly and unequivocally determined, time and time again, that unduly tight or excessively forceful handcuffing is a clearly established violation of the Fourth Amendment." *Baynes*, 799 F.3d at 613. The plethora of excessive-force handcuffing cases from the last three decades put Easlick on notice that the way that he yanked Hughey's arm, placed overly tight handcuffs around her wrists, and ignored her complaints of pain violated her right to be free from excessive force. *See id.* at 613–14 (collecting decades of Sixth Circuit cases about handcuffing).

## III. CONCLUSION

Easlick is not entitled to summary judgment because Hughey has created a genuine dispute of material fact about whether Easlick violated her clearly established constitutional right to be free from excessive force. We thus **REVERSE** and **REMAND** for further proceedings.