*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0145p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 02-6457

ALBERTO MONCIVAIS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 01-20087—Robert H. Cleland, District Judge.

Argued: November 30, 2004

Decided and Filed: March 24, 2005

Before: NORRIS and COOK, Circuit Judges; BECKWITH, Chief District Judge.[*]

_____

## COUNSEL

**ARGUED:** E. E. Edwards III, Nashville, Tennessee, for Appellant. Scott F. Leary, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee. **ON BRIEF:** E. E. Edwards III, Nashville, Tennessee, for Appellant. Stuart J. Canale, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee.

_____

## OPINION

_____

BECKWITH, Chief District Judge. Defendant Alberto Moncivais appeals the district court's denial of his motion to suppress a recorded telephone conversation, which Moncivais challenges as illegally intercepted and unreliable. He challenges his arrest for lack of probable cause. And, he appeals his sentence base level and an enhancement imposed by the district court.

_____

[*]The Honorable Sandra S. Beckwith, Chief United States District Judge for the Southern District of Ohio, sitting by designation.

I.      Background.

On Friday, April 6, 2001, undercover law enforcement officers received ten kilograms of cocaine from Jerome and Anthony Davis at their auto repair shop.  The Davis brothers were promptly arrested.  Jerome Davis ("JD") agreed almost immediately to cooperate with the police investigation of their drug supplier.  JD revealed that Ruben Laurel had been their source for a 75 kilogram shipment the Davis brothers received in Memphis on April 5.  Anthony Davis ("AD"), who decided to cooperate with the police the day after his arrest, supplied information for a search warrant  that led to the recovery of 58 kilograms of the cocaine on Sunday, April 8.

JD met with Laurel and others on Beale Street in the evening of April 7, a meeting observed by undercover officers.  A recording of that meeting was unusable due to background noise.  According to Officer Campbell's testimony at the suppression hearing, JD reported that Laurel said "his people" or "his man" was "in town"or "coming to town," and that Laurel needed to "get this stuff back," presumably referring to the cocaine.

Later that same evening, JD called the DEA officers because he had been asked, by someone he did not identify, to lend his car so "they" could meet someone at the airport.  The officers asked him to wait until they could "wire" his car, but JD soon called back to say that "they" had called JD again, saying they found someone else to go to the airport.

On Sunday April 8 at about 9:00 p.m., JD talked to Laurel, a conversation that was recorded.  Laurel told JD that "they" were about to call Laurel, and that "They want to get it.  There's people here waiting to take it."  JD assured Laurel that "it" was safe, and that he would have AD call Laurel to talk further.  At approximately 9:45 p.m., AD talked with Laurel on AD's cell phone.  AD agreed to allow the police to record the conversation.  Laurel repeatedly expressed great concern for the whereabouts of "it" (presumably the cocaine).  AD assured Laurel that AD would have "it" for delivery the next day.  Laurel expressed concern for his life, saying that "they can't wait." Laurel asked AD several times, "You can't go get it right now?" or "Why can't we get it right now?" Eventually, AD asked Laurel if he wanted AD to "talk to them."  Laurel said "hold on, I'm gonna call him on three way you talk to him okay?"  AD agreed, and Laurel dialed a number that turned out to be the Holiday Inn in downtown Memphis.  Laurel asked for Room 669, a guest named "Albert."

A conversation in Spanish then ensued between Laurel and the then-unidentified man who answered the phone in Room 669.  A Spanish translator retained by Moncivais testified at the suppression hearing that the following English translation was, to a reasonable certainty, exactly what was said:

| | |
|---|---|
| [Unidentified]: | Yeah. |
| [Laurel]: | (unintelligible words) I have my friend the AD on the line. |
| [Unidentified]: | What for? |
| [Laurel]: | Well he wants to talk to you. |
| [Unidentified]: | What for? |
| [Laurel]: | For you to know that every thing is all right. |
| [Unidentified]: | But no, no, you know what you have to do.  Are you going to go to eat right now?          (Inaudible voice . . . .of you all) |

| [Laurel]: | Actually that's what I'm telling him.[1] |
| [A. Davis]: | Hello, Hello |
| [Unidentified]: | Yeah Ruben? |
| [Laurel]: | Yeah |
| [Unidentified]: | Don't talk to me right now, please. |
| [Laurel]: | All right. |

At this point, Laurel dropped the man in Room 669, but immediately said to AD, "He wants it right now" and "Just go and get it."

Shortly after this conversation, the investigating officers learned that defendant Alberto Moncivais was registered in Room 669 at the Memphis Downtown Holiday Inn. They also learned he had flown to Memphis from San Antonio, Texas on Saturday, April 7, and was scheduled to leave on Monday morning, April 9. Moncivais was arrested without a warrant at the Memphis airport at 7 or 8 a.m. on Monday, April 9.[2]

Officer Scott Campbell executed an affidavit in support of the criminal complaint against Moncivais on April 10. Campbell set out many of the details of the information obtained from the Davis brothers and the investigation that ensued after their arrest. He also recited another officer's (INS Special Agent Evans) interpretation of the Spanish conversation between Laurel and Moncivais on April 8. The government admitted during the suppression hearing that Evans' interpretation was not a literal translation. The government also stipulated to the Spanish translation of the conversation offered by Moncivais.

Moncivais was subsequently indicted on several counts for conspiracy to distribute cocaine. After his motion to suppress was denied, he pled guilty to one count of conspiracy to distribute in excess of 5 kilograms of cocaine, reserving his right to appeal the suppression rulings. He was sentenced to 360 months incarceration, and supervised release for five years.

II.     Standard of Review.

In reviewing a ruling concerning a motion to suppress, this Court reviews factual findings for clear error, and legal determinations de novo. *United States v. Pelayo-Landero,* 285 F.3d 491, 494 (6th Cir. 2002). This Court will overturn a district court's factual findings only if we are of the "definite and firm conviction that a mistake has been committed." *United States v. Worley,* 193 F.3d 380, 384 (6th Cir. 1999). In reviewing a denial of a motion to suppress, this Court considers the evidence in the light most favorable to the government. *United States. v. Erwin,* 155 F.3d. 818, 822 (6th Cir. 1998). We review de novo a determination of probable cause for the warrantless arrest. See *Ornelas v. United States*, 517 U.S. 690, 697-99 (1996); *United States v. Williams*, 949 F.2d 220 (6th Cir. 1991).

---

[1] This remark, made in English, was not included in the defendant's original translation transcript. However, during the suppression hearing the translator conceded she could hear this on the tape recording.

[2] Laurel was arrested the next day. His separate appeal of the district court's suppression rulings was denied; see *United States v. Laurel*, 103 Fed. Appx. 875 (6th Cir., July 8, 2004).

A.        *The Recorded Telephone Call*.

Moncivais contends that use of the recording of the conversation between him and Laurel with Anthony Davis on the line violates the Fourth Amendment and the Federal Wiretap Statute.

18 U.S.C. §2510 et. seq. bars the use of any illegally intercepted wire communication.  An interception is not illegal if "one of the parties to the communication" gives prior consent.  See 18 U.S.C. §2511(2)(c).  While Davis clearly consented to the interception of the call made to him from Laurel, Moncivais argues that neither he nor Laurel consented to the interception of their conversation.  Moncivais posits that the only reasonable interpretation of the transcript is that he was unaware of Davis' presence "on **the** line" (as opposed to on "another" line or "holding" on "the" line) until Davis actually spoke up.  Then, Moncivais posits, he was startled and surprised, and abruptly told Laurel that he didn't want to talk to him anymore.

The district court found that Moncivais had actual notice that Davis was "on **the** line" at the start of the Laurel-Moncivais conversation.  The magistrate judge listened to the audio tape of the conversation a number of times.  He rejected Moncivais' interpretation of his statements.  He concluded that Moncivais' remark to Laurel, "You know what you have to do . . ." meant that Moncivais had "stated his position and there was nothing more to say."   The district court agreed, holding:

> The fact that Moncivais addressed his comments during the call to Laurel and ignored Davis is easily understood as a superior addressing his subordinate while studiously ignoring the bystander.  His behavior in this regard does not alter the court's conclusion.  The presence of a third person was known to Moncivais and he thus is deemed to have consented to the possibility that the third person would record the conversation.

The district court relied on *Rathbun v. United States*, 355 U.S. 107, 111 (1957), where the Supreme Court held: "Each party to a telephone conversation takes the risk that the other party may have an extension telephone and may allow another to overhear the conversation.  When such takes place there has been no violation of any privacy of which the parties may complain."

This principle was applied in *United States v. Miller*, 720 F.2d 227 (1st Cir. 1983).  There, three people were involved in a counterfeit bill distribution conspiracy.  Party #1 was caught and agreed to cooperate with the authorities.  With a recording device installed on her line, Party #1 called Party #2 and asked for more counterfeit bills.  Party #2's phone had a conference ability, permitting him to connect a third person.  Party #2 then called Party #3, said he had Party #1 "on the other line," and asked Party #3 for more bills to be delivered.  The exchange between Party #2 and #3 was recorded on Party #1's recording device.  Relying on *Rathbun*, the First Circuit rejected Party #3's challenge to use of the recording, concluding that Party #2 had consented to Party #1, in effect, "listening in" on an extension telephone.

Here, Laurel identified Davis' presence much more directly than was done in *Miller*.  Laurel told Moncivais "I have AD on the line," not that AD was on "the other line" or was "holding on the line."  And, Laurel certainly consented to Davis listening to his conversation with Moncivais. Indeed it was Laurel who volunteered "Okay, hold on, hold on, hey, I'm gonna call him on three way you talk to him okay?"  The district court rejected Moncivais' attempt to create an ambiguity in the phrase "on the line" after listening to the tape and hearing the testimony of both the government's witnesses and defendant's expert translator.

As was held in *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985), "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be

clearly erroneous. This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." (citations omitted) Based upon our review of the record, the district court's interpretation is both permissible and reasonable, and therefore not clearly erroneous. Use of the tape violates neither the Fourth Amendment nor the federal wiretap statute. In view of our conclusion, we decline to address the government's alternate argument, that the "plain hearing exception" discussed in *United States v. Baranek*, 903 F.2d 1068 (6th Cir. 1990) applies to these facts.

Moncivais also argues that the tape of the telephone call should have been disregarded entirely because the sound quality was too poor to meet minimum reliability standards. Moncivais relies on *United States v. Robinson*, 707 F.2d 872 (6th Cir. 1983), which held that recordings are inadmissible if the "unintelligible portions are so substantial as to render the recording as a whole untrustworthy." *Id*. at 876 (citations and internal quotation marks omitted). As noted above, Moncivais hired his own expert translator. She testified at the suppression hearing that, while the tape was difficult to hear clearly, she was able to produce a transcript of substantially all of the conversation, as well as an English translation with which the government agreed. The district court found the tape was sufficiently trustworthy based on those facts. We review this determination for abuse of discretion, *United States v. Scarborough*, 43 F.3d 1021, 1024 (6th Cir. 1994), and find none.

B.          *Probable Cause for Moncivais' Arrest*.

Moncivais also challenges his warrantless arrest at the Memphis airport on April 9, 2001, contending the government lacked probable cause. Moncivais primarily argues that, without the disputed tape recorded conversation with Laurel, probable cause is absent. He also argues that Officer Campbell's April 10 affidavit supporting the criminal complaint was false in reporting the details of that conversation, thus demonstrating a lack of probable cause for his arrest the day before.

We have already found the tape recording was sufficiently trustworthy and admissible for purposes of the motion to suppress. We reach the same conclusion concerning its use in the probable cause analysis.

The establishment of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Barrett*, 890 F.2d 855, 861 (6th Cir. 1989) (superceded on other grounds). The judicial determination of probable cause involves evaluating the historical facts leading up to the arrest, and whether those facts, viewed by an "objectively reasonable police officer," satisfy the legal standard of probable cause. *Ornelas v. United States*, 517 U.S. at 696.

The critical events leading to Moncivais' arrest occurred over a relatively short time span. Those events included: (1) information AD provided after his arrest led to the recovery of 58 kg of cocaine on April 8; (2) JD was told that someone likely connected with the drug suppliers was arriving at the Memphis airport on Saturday, April 7; (3) Laurel told JD on April 7 during the Beale Street meeting that "they" were either in town or coming to town; (4) Laurel displayed obvious distress to both JD and AD about threats "they" were making if the drugs were not immediately delivered; (5) after an extended conversation about when AD would deliver the drugs, Laurel placed the call, with AD on the line, to Room 669 at the Holiday Inn so that AD could "talk to him" about it; (6) Laurel identified the "major" actors in the drug scheme as being from Texas; (7) Moncivais had checked into Room 669, and had arrived in Memphis from Texas on April 7; and (8) Moncivais had a reserved flight out from Memphis on Monday morning, April 9. Given these facts, and the substance of the tape recorded conversation, the "totality of the circumstances" supports "an objectively reasonable police officer's" conclusion that Moncivais was involved in the drug scheme.

We also reject Moncivais' assertion that Officer Campbell's affidavit was "recklessly false" in relaying Agent Evans' interpretation of the Laurel-Moncivais telephone conversation. The affidavit stated: "Evans related that Laurel told Moncivais that [Davis] has "it" and that everything is OK but that it may take a little while longer. Moncivais responded to Laurel to hurry up and get the stuff so they can get out of there (presumably Memphis, Tennessee.)"

Under *United States v. Campbell*, 878 F.2d 170, 171 (6th Cir. 1989), a defendant must make a "substantial" showing that the affidavit is deliberately or recklessly false. This Court has explained: "A defendant who challenges the veracity of statements made in an affidavit that formed the basis for a warrant has a heavy burden. His allegations must be more than conclusory. He must point to specific false statements that he claims were made intentionally or with reckless disregard for the truth." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (citations omitted).

The district court rejected Moncivais' argument that the affidavit was actually false, concluding that the discrepancy was attributable to "differing interpretations" of the conversation. While we conclude that the evidence establishes that Moncivais did not literally say the words Campbell reports in his affidavit, Evans' conclusion relayed to Campbell about the import of the conversation is not so far off the mark to render it "recklessly false." Testimony at the suppression hearing established the officers' reasonable belief that drug dealers often talk in "code." Moncivais said to Laurel, "But no, no, you know what you have to do. Are you going to go eat right now?" The reference to eating is nonsensical, and could be interpreted as referring to something else that Laurel was to do "right now" -- such as retrieve the drugs. Moreover, there is nothing in the record to suggest that Evans or Campbell made a **deliberate** false statement in their reporting about the conversation.

We therefore affirm the district court's conclusion that probable cause existed for the warrantless arrest of Moncivais on April 9.

C.     *Sentencing Challenges*.

Moncivais also maintains that the district court violated his Sixth Amendment rights when it enhanced his sentence based upon facts not proved to a jury beyond a reasonable doubt or admitted to in his guilty plea. Because Moncivais did not raise this challenge in the district court, we review his sentence enhancements for plain error. *United States v. Oliver*, ___ F.3d ___, 2005 WL 233779, *6 (6th Cir. 2005). To warrant correction under plain-error review, an error must be plain, affect substantial rights, and substantially affect the fairness, integrity, or public reputation of judicial proceedings. *Johnson v. United States*, 520 U.S. 461, 466 (1997). After the Supreme Court's recent decision in *United States v. Booker*, 125 S.Ct. 738 (2005), a sentence enhancement in violation of the Sixth Amendment is an error that is plain. *Oliver*, 2005 WL 233779, at *7.

And, here, the error also affected Moncivais' substantial rights. Based solely on Moncivais' criminal history and the facts he admitted in his guilty plea, Moncivais' offense warranted a sentencing range of 235 to 293 months. As a consequence of the district court's findings regarding relevant conduct and Moncivais' role in the offense, however, the Sentencing Guidelines mandated a sentence between 360 months and life. The district court sentenced Moncivais to 360 months imprisonment, the lowest sentence it could impose given the binding nature of the Guidelines. Thus, the district court might have imposed a different sentence if it had not considered the Guidelines mandatory.

Finally, such unconstitutional judicial fact-finding violates the fairness, integrity, and public reputation of judicial proceedings. *Id*. at *8. Accordingly, we vacate Moncivais' sentence and remand to permit the district court to resentence him in a manner consistent with *Booker*.