**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a1196n.06

**No. 11-2616**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Nov 20, 2012*

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| CHRISTOPHER WAYNE BOWSER, | ) | WESTERN DISTRICT OF MICHIGAN, |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE:  BOGGS and CLAY, Circuit Judges; and STAFFORD, District Judge.[*]

**STAFFORD, District Judge.**  The appellant, Christopher Wayne Bowser ("Bowser"), appeals from the judgment entered against him following his conditional plea of guilty to possession with intent to distribute marijuana.  Bowser entered his plea after the district court denied his motion to suppress the marijuana found by officers in a closed cooler in Bowser's residence.  Bowser reserved his right to appeal the district court's finding that Bowser consented to the search of the cooler in which the marijuana was found.  We **AFFIRM** Bowser's conviction.

I.

A.

On December 7, 2010, Bowser was charged in federal court with (1) conspiracy to distribute and possess with intent to distribute marijuana; and (2) possession with intent to distribute

---

[*] The Honorable William H. Stafford, Jr., Senior United States District Judge for the Northern District of Florida, sitting by designation.

marijuana. Bowser thereafter filed a motion to suppress the marijuana that was seized from Bowser's residence by two law enforcement officers who, at the time, were conducting a "knock and talk" interview with Bowser. The motion to suppress triggered two evidentiary hearings before Magistrate Judge Greeley. Four witnesses testified at the hearings: United States Drug Enforcement Agency ("DEA") Special Agent Jeffrey Poikey ("Poikey"), Michigan State Police Detective/Trooper Christopher Croley ("Croley"), Lindsay Treado ("Treado") (Bowser's live-in girlfriend), and Bowser. The testimony of the two officers regarding the relevant facts was entirely different from the testimony of Bowser and Treado. Judge Greeley explicitly found that "the testimony of Special Agent Poikey and Detective Trooper Croley was credible" and "the testimony of [Bowser] and Ms. Treado was not credible."

The credible testimony established the following:

During the summer of 2010, Michigan's Upper Peninsula Substance Enforcement Team ("UPSET") and special agents from the DEA investigated a large outdoor marijuana-growing operation in Iron County, Michigan. Poikey and Croley were both involved in that investigation.

Sergio Placencia-Cruz was a suspect in the Iron County investigation. After Placencia-Cruz was seen getting into a truck registered to Bowser, Poikey and Croley went to Bowser's residence to see if they could conduct a "knock and talk" interview with Bowser. Knowing that Bowser—a convicted felon—had previously cooperated with UPSET in a narcotics investigation, the officers were hopeful that Bowser would be cooperative and provide them with useful information. The officers did not have a warrant.

Treado answered the door when the officers arrived and allowed them to enter the house. Bowser arrived home a few minutes later. When the officers asked to speak with Bowser in private, Bowser led the officers down a hallway to an office in the back of the house. Once in the room, Bowser realized that a pipe and two small bags of marijuana were sitting on the desk. He quickly turned around and suggested to the officers that they talk in another room. His suggestion came too late, however, because the officers had already detected the odor of marijuana and had seen the baggies of marijuana on the desk. Until the drugs were secured, the officers were unwilling to move to another room. While Poikey informed Bowser that he (Poikey) was not greatly concerned about a couple of ounces of marijuana, Croley took possession of the drugs and paraphernalia, placing them in a bag provided by Treado. Bowser was not arrested, did not renew his request to move to another room, and assured the officers that he wanted to cooperate. What followed was a lengthy interview lasting almost an hour and a half, an interview during which Bowser willingly provided information about his drug activities, about his drug sources, about the quantities and people with which/whom he was involved, about guns, and about his finances. Bowser repeatedly stated throughout the interview that he wanted to cooperate with the officers.

About halfway through the interview, Croley noticed a cooler tucked underneath the L-shaped desk where Bowser was sitting. When Croley asked what was in the cooler, Bowser said without hesitation that it contained "more weed." On his own initiative, Bowser moved his desk chair, pulled the cooler out from under the desk, and pushed it over to Poikey, who immediately opened the cooler and removed three large bags of marijuana. Poikey did not ask for Bowser's permission to open the cooler. Neither Poikey nor Croley searched any other area in Bowser's house.

3

The interview was ultimately terminated at Bowser's request. Bowser explained that he was expecting company and he did not want his company—a good friend of his marijuana source—to see the officers. The officers agreed that it would be prudent for them to leave before Bowser's company arrived. Bowser assured the officers that he wanted to continue his cooperation, and it was agreed that the interview would be resumed at another time.

B.

Based on the credible evidence adduced at the two suppression hearings, Magistrate Judge Greeley recommended to the district court that Bowser's motion to suppress the marijuana found in the cooler be denied. The district court adopted that recommendation, stating:

> [T]he Magistrate Judge properly found that [Bowser's] cooperative attitude extended to notifying the officers that there was marijuana in the cooler and sliding the cooler over to Special Agent Poikey. The Court is satisfied that the totality of the evidence supports a finding that [Bowser] gave the officers implied consent to search the cooler, and that the consent was unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.

Bowser thereafter entered into a conditional plea agreement with the government, pleading guilty to Count 2 of the indictment, which charged him with possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Bowser reserved his right to seek review of the district court's finding that he "gave the officers implied consent to search the cooler, and that the consent was unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." Count 1 of the indictment, charging him with a conspiracy to possess marijuana with the intent to distribute, was dismissed at the time of sentencing. After judgment was entered, Bowser filed this appeal.

II.

We review the denial of a motion to suppress for clear error as to factual findings and *de novo* as to conclusions of law. *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004). Whether a defendant voluntarily gave his consent to a search is a factual issue and is therefore reviewed for clear error. *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (*en banc*). When reviewing the denial of a motion to suppress, we must consider evidence in the light most favorable to the government. *Id.* We must also "give deference to the district court's assessment of credibility inasmuch as the court was in the best position to make such a determination." *United States v. Hill*, 195 F.3d 258, 264–65 (6th Cir. 1999). This court has repeatedly held that "[f]indings of fact anchored in credibility assessments are generally not subject to reversal upon appellate review." *United States v. Hudson*, 405 F.3d 425, 442 (6th Cir. 2005) (internal quotation marks omitted).

III.

This appeal raises only one issue: Did the district court err when it found that Bowser gave implied consent to the officers to search the cooler? The credible evidence establishes that the district court made no such error.

This court has recognized that consent to search may be given not just by words but also by gesture or conduct. *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (*en banc*). Whatever its form, consent must be "voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011) (internal quotation marks omitted). Whether consent is "voluntary, unequivocal, specific, intelligently given, and

uncontaminated by duress or coercion" is a question of fact to be determined from the totality of all the circumstances. *Id.*

In *United States v. Reynolds*, 646 F.3d 63, 73 (1st Cir. 2011), the First Circuit found that the defendant's words and gestures were sufficient to support a finding of implied consent despite the absence of an express request by the officers for permission to search. In that case, police officers responded to a call from a man complaining about an unwelcome woman in his residence. When the officers arrived at the residence, the man pointed them to a bedroom, advising them that the woman was inside with two unloaded firearms. The officers entered the bedroom where they found the woman lying on a bed. When asked whether she had any guns, the woman answered "yes" and pointed to the headboard behind her. The guns were not visible. Without asking for permission to search, one of the officers opened a compartment within the headboard and, upon seeing two guns, removed them. When the woman was later charged with firearms violations, she moved to suppress the firearms, arguing that her answer affirming the presence of weapons and her gesture towards the headboard did not constitute implied consent. The district court denied her motion to suppress. On appeal, the First Circuit affirmed the district court's decision, stating: "It was reasonable for the district court to find that Reynolds' gesture to the headboard when answering "yes" to whether she had weapons demonstrated that Reynolds understood the police officer intended not only to learn of the existence of the weapons, but also to find them." *Id.* at 73.

We reach a similar result in this case where the relevant facts—established through the credible testimony of Poikey and Croley—are that (1) the officers approached Bowser without force, hoping to get his cooperation and assistance with a large-scale marijuana operation then being

investigated by UPSET; (2) the officers knew that Bowser had previously cooperated with UPSET; (3) Bowser voluntarily led the officers to a back room in his house where small baggies of marijuana were seen in plain view; (4) Bowser thereafter advised the officers that he was willing to cooperate and to answer questions; (5) Bowser was, in fact, cooperative throughout an interview that lasted eighty to ninety minutes; (6) Bowser willingly provided the officers with information about his drug activities, his drug sources, and his finances; (7) Bowser advised the officers, in response to a question about the cooler, that "more weed" was inside; (8) Bowser on his own initiative removed the cooler from the inside corner under the L-shaped desk and pushed it over to Poikey; (9) Bowser expressed no objection to Poikey's opening of the cooler; and (9) no other search was conducted on the premises. Under these circumstances, it was reasonable for the officers to assume that, by pushing the cooler with its already-identified contents directly in front of Poikey, Bowser expected—indeed invited—Poikey to open the cooler. The district court was not clearly erroneous in finding that, by his words and actions, Bowser voluntarily consented, without any coercion or duress, to a search of the cooler.

Bowser's arguments to the contrary are unpersuasive. Among other things, Bowser contends that the officers' conduct was coercive, vitiating any consent that might otherwise be implied. According to Bowser, his consent was coerced because the officers "forced Mr. Bowser to sit, blocked his exit from the room, and were armed and physically imposing." Such conduct, however, is insufficient to establish coercion where the evidence establishes that Bowser willingly cooperated with officers who came to his home seeking his assistance and who made no arrest, used no force, drew no weapons, made no false promises, uttered no threats, and conducted no general search. *See*

7

*United States v. Canipe*, 569 F.3d 597, 603–04 (6th Cir. 2009) (holding that consent was voluntary despite presence of multiple armed officers); *United States v. Esquivias*, 416 F.3d 696, 700 (8th Cir. 2005) (finding consent voluntary despite the fact that a physically-imposing uniformed officer blocked the defendant's path when he tried to leave).

Bowser also contends that his willingness to cooperate with regard to the Iron County investigation cannot be used as a basis for implying a voluntary consent to search his personal property. He adds that "simply telling an officer there is contraband located somewhere cannot be construed as unequivocal and specific consent to search that location." These factors, however, were not the only ones used by the district court to support its finding that Bowser gave implied consent to search the cooler. There were other factors as well, most notably Bowser's action of pulling the cooler from under the desk and pushing it over to Poikey, which action occurred after Bowser identified the contents of the cooler as "more weed" and after he repeatedly stated that he wanted to cooperate with the officers. Given the totality of the circumstances, the district court did not clearly err when it found that Bowser consented to Poikey's search of the cooler and that his consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.

**AFFIRMED.**