NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0035n.06

Case No. 24-3350

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| JOHN COOK, | ) | |
|     Plaintiff-Appellant, | ) | |
|  | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
|  | ) | |
| DAVID BOSS, et al., | ) | |
|     Defendants-Appellees. | ) | OPINION |
|  | ) | |

Before: THAPAR, NALBANDIAN, and RITZ, Circuit Judges

NALBANDIAN, Circuit Judge. Officer David Boss ran a random license plate check on John Cook's truck as he was driving it through Lyndhurst, Ohio. The police database listed it as stolen. So Boss pulled the truck over and handcuffed Cook. Only then did Boss learn that the truck was Cook's. It had been stolen from Cook in Cleveland a few months before, but he recovered it on his own. Cook never had a "call-off" report filed with police, though, so no one had removed the "stolen" tag in the database.

Cook sued Boss, other officers, and the cities of Lyndhurst and Cleveland for civil rights violations. The district court granted summary judgment for all defendants. Because we find that the officers acted lawfully, we affirm.

## I.

John Cook made a career of public service. He served in the Army, the Cleveland Fire Department, and the Ohio Department of Rehabilitation and Corrections. And when not working

for the government, he served his community in other ways, like working at a home for troubled youth and as a gun instructor at his local range. In the years before this case, Cook went full time as a construction contractor and had his own company, Jaden Construction Group. He also joined Midwest Medical Transport on the side as a medic.

In April 2020, someone stole one of Jaden Construction Group's trucks, a Dodge Ram 3500. Cook reported the theft to Cleveland police and a detective began investigating. But a few days later, Cook found the truck on his own and took it back.

What happened next is unclear. Cook claims that he received a call from the detective and let the detective know he'd gotten the truck back. Cook also claims that the detective was suspicious about Cook doing his own police work, so when the conversation became heated, Cook hung up. In contrast, the detective states that Cook called him and left a voicemail explaining the recovery. The detective insists that he tried to call Cook back a few times, but never reached him and couldn't leave a return message because Cook's voicemail was full. But on either account, the upshot is clear—Cook didn't follow through and complete the proper procedures for the police to delist his truck from their stolen vehicle database.

Cleveland police have a vehicle recovery protocol. Under the department's General Police Order 6.2.13, before a recovered vehicle comes off the "stolen" list, law enforcement must personally inspect it for evidence that could help with their investigation, like missing parts or plates, vehicle damage, tampering with the vehicle identification number (VIN), and the like. After the inspection, officers must submit a report to the police intake unit. Only then do they remove a stolen vehicle entry from the database. (Order 6.2.13 even notes that when owners take back vehicles at the scene of recovery, officers must warn them that "they are subject to being stopped" until someone processes the report. R. 39-2, Bellanca Decl., p.16, PageID 511.) Without

following these procedures, police would struggle to confirm that the legal owner had recovered a missing vehicle. Anyone—including the thief—could call in to say they had "recovered" the vehicle and wave off the investigation.

Cook didn't bring his truck in for inspection. On his account of the call with the detective, Cook felt that the detective was "a little short" with him after Cook relayed how he got his truck back, so Cook ended the call. R. 42-1, Cook Dep. v1, p.116, PageID 1368. He testified: "I just told him that my stuff had been returned and I no longer needed police assistance and that was it for me with the conversation." *Id.* He then disconnected his head set without the detective informing him of the recovery protocol. The detective claims that he tried again to get in touch with Cook, but with no success. The city prosecutor eventually closed the case, citing the uncooperative nature of the victim.

As a result, the truck remained listed as "stolen" in the database. And that's all Officer Boss saw when he checked its license plate while on patrol one night.

Vehicle theft in Ohio is a felony. Ohio Rev. Code § 2913.02(B)(5). So Officer Boss, thinking he'd just found a felon, pulled Cook over as Cook pulled up to his home in Lyndhurst (near Cleveland) around 1:00 AM on July 30. Boss called for backup, and Officer Jonathan Romanin arrived on the scene. They turned on their body cameras and ordered Cook out of the truck at gunpoint.

Cook complied. He stepped out of the truck, walked slowly toward the officers, knelt in the road, and raised his hands. Officer Romanin then handcuffed him. After cuffing Cook's right hand and moving it toward his back, Romanin realized that the arm didn't move well and asked him: "This arm doesn't go back any further?" Romanin Video 2:31. Cook explained that he had a rotator cuff issue. *Id.* at 2:33. So Romanin pulled out another set of cuffs and linked the ends of

3

the two pairs together, essentially forming one set of cuffs double the normal length, so that Cook's arms weren't drawn behind him so tightly. *Id.* at 2:47. Romanin and Cook then walked over to the police cars.

Romanin searched Cook's pockets while Cook tried to clarify the situation. He told the officers that the truck was his, that it wasn't stolen anymore, and that they were standing in front of his house, which had paperwork proving his ownership. After the search, Romanin opened the backseat door of his cruiser, and Cook—who is a tall, broad man—stated: "Oh, I ain't gonna be able to get back there," referencing a knee surgery he'd had. *Id.* at 5:47. So Romanin told him to simply lean back on the edge of the open car, still standing on the street. *Id.* at 5:49. Officer Boss, meanwhile, radioed back to headquarters to let them know that he may have stopped the legal owner of the truck and that he planned to confirm Cook's identification and, if it checked out, let him go.

By that time, two other Lyndhurst officers—Kelly Vasas[1] and Justin Blatnick—had arrived. The four officers then split up. Boss and Vasas went up to Cook's house, while Romanin and Blatnick stood with Cook at the police cars.

Boss and Vasas walked up Cook's driveway, noticing on the way another car with vanity plates for "Jaden," Cook's construction company. Then they rang the doorbell and Cook's wife, Tonya McDade, answered. She told them that his truck had been stolen and recovered. Boss asked: "Do you have anything that shows that he owns it, any paperwork?" Boss Video 9:28. She replied that she was "trying to find it now." *Id.* at 9:30. At that point, McDade turned back into the house, leaving the door open. *Id.* Officer Boss took a step forward, though remaining outside,

---

[1] Her name was Kelly Vasas at the time of the stop in July 2020, so that's what we'll call her here. She has since married and changed her name.

and reiterated that he was trying to confirm the truck's ownership to release Cook. *Id.* McDade kept speaking as she walked away, though her exact words are inaudible on the video, and she went up the stairs to the second floor. *Id.* at 9:32.

A few moments later, Boss took two steps into the foyer and called up the stairs: "What's the name of his company?" *Id.* at 9:54; Vasas Video 8:00. She shouted back that it was Jaden Construction. Boss Video 9:58. Boss stood there for about a minute, waiting, and then asked headquarters over the radio for the truck's registration. They radioed back that it was registered to Jaden Construction. Then, before McDade came back with paperwork, Boss turned around to Vasas and ordered Cook's release. Boss pointed to the car in the driveway: "I mean, it says 'Jaden' right there on the frickin' plate." *Id.* at 11:19. He radioed Officers Romanin and Blatnick to let Cook go, telling them that "it's gonna check okay." *Id.* at 11:28.

After another few seconds, Officer Boss stepped back in and called up the staircase to McDade, asking if she'd found paperwork and requesting permission to go up the stairs. *Id.* at 11:44; Vasas Video 9:50. She hollered back: "Yes, I don't care." Boss Video 11:50. Boss and Vasas then walked up the stairs into the bedroom, where she handed them company checks for Jaden Construction. *Id.* at 11:52. Boss told her that the checks confirmed Cook's story, explained once again that the truck came up as stolen in the database, and apologized multiple times for having detained him. *Id.* at 12:08. The officers then left the house. From the time McDade answered the door to when the officers left, about three and a half minutes passed.

Now rewind a bit. While Officers Romanin and Blatnick stood with Cook by the police cars, Cook asked to readjust the handcuffs twice. He brought it up the first time about a minute after the officers had him lean back against their car, stating that he was "losing circulation in [his] hand." Romanin Video 6:45. Romanin had his hands full searching Cook's wallet but

5

acknowledged the statement right away. *Id.* at 6:47. He put the wallet back together, and then put it down. *Id.* He pulled on a pair of latex gloves, had Cook turn around, took off the offending cuff, and rearranged it. *Id.* at 7:00. The time that elapsed from Cook's comment to Romanin beginning to remove the cuff was just over thirty seconds.

The second request came a few minutes later. After Cook and the officers made some small talk, Cook mentioned again that the cuffs were bothering him. He told them that he "broke [his] thumb on the job" and that he was "losing feeling in it." *Id.* at 11:50. At the same time as he spoke, the radio call came in from Officer Boss to let Cook go. So Romanin immediately began taking the cuffs off. In twenty seconds, Cook had one hand free, and in another twenty seconds he had both free.

With things cleared up, Cook got back in his truck. The officers apologized for having to pull him over, thanked him for his cooperation, and told him to call Cleveland police again to have his truck removed from the database. Then they left. And as it turned out, Cook didn't even need to contact Cleveland police because they removed the truck from the database on their own that night after Lyndhurst dispatch called them.

Cook later sued the four Lyndhurst officers with Fourth Amendment claims under 42 U.S.C. § 1983. He claimed that they wrongfully stopped him, used excessive force in handcuffing him, and unlawfully entered his home without consent. He also sued the cities of Lyndhurst and Cleveland for *Monell* violations. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The district court granted summary judgment for the defendants based on qualified immunity. Cook appealed.

During the litigation, Cook tried to secure expert reports on the use of force, medical care, and economic damages, but repeatedly failed to meet his court-ordered deadlines. When he

designated his experts and submitted the reports late, the district court found no good cause for the delay and excluded them as untimely. Cook appealed that ruling too.

## II.

We first consider the expert reports. Cook submitted his expert reports well past the court's deadlines and provided no excuse, so the district court barred them. But while Cook has nominally appealed the exclusion, his opening brief makes no argument on why we should reverse. The brief makes a passing reference to the expert reports in the statements of jurisdiction and issues, but beyond that? Crickets. The argument section never speaks to it. Cook does not explain his delay, identify the relevant legal standard, apply any law to any facts, or spell out why we should reverse. He has thus forfeited the matter. *See Golden v. Comm'r*, 548 F.3d 487, 493 (6th Cir. 2008).

Cook develops an argument in his reply brief. But that is "one brief too late." *Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018). Saving one's arguments for the reply brief unfairly deprives the opposing parties of the chance to respond. "Time, time, and time again, we have reminded litigants that we will treat an argument as forfeited when it was not raised in the opening brief." *Id.* (internal quotation marks omitted). So we decline to disturb the district court's ruling.

## III.

We now consider summary judgment. District courts grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review these grants de novo, drawing all reasonable inferences for the nonmoving party. *Walden v. Gen. Elec. Int'l, Inc.*, 119 F.4th 1049, 1056 (6th Cir. 2024). But to avoid summary judgment, the nonmoving party cannot rely on mere "[c]onjecture" or "conclusory accusations." *Id.* (internal quotation marks omitted). There must

be "significant probative evidence" that puts the material facts in doubt. *Green Genie, Inc. v. City of Detroit*, 63 F.4th 521, 526 (6th Cir. 2023) (internal quotation marks omitted).

Though the nonmovant gets the benefit of the doubt when the parties tell competing stories, we do not credit factual claims "utterly discredited" by video evidence in the record like body-camera footage. *Scott v. Harris*, 550 U.S. 372, 380 (2007). We have such evidence here. So if the videos "show facts so clearly that a reasonable jury could view those facts in only one way," we won't draw any inferences to the contrary. *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017).

**IV.**

Qualified immunity protects police officers from suits for damages when their acts did not violate clearly established constitutional rights. *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021). So a plaintiff must show two things to prevail in a § 1983 suit. First, he must show that the officer violated his constitutional rights. And second, he must show the conduct was clearly established as unconstitutional as that time. *Id.*

We treat a right as clearly established if "every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted). Then-existing caselaw must put the officer's actions beyond the pale. *Id.* at 11–13. Qualified immunity thus gives police officers "breathing room" for "reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Only the "plainly incompetent or those who knowingly violate the law" cannot claim the doctrine's protection. *Id.* (internal quotation marks omitted); *see also Smith v. City of Wyoming*, 821 F.3d 697, 708 (6th Cir. 2016).

**A.**

Cook first claims that Officer Boss unlawfully pulled him over and arrested him. Traffic stops like this one are "seizures" under the Fourth Amendment, so they must be reasonable. *Navarette v. California*, 572 U.S. 393, 396–97 (2014). Under *Terry v. Ohio*, "brief investigative stops" are reasonable when an officer has "reasonable suspicion" that criminal activity is occurring. *Id.* (internal quotation marks omitted); *see Terry v. Ohio*, 392 U.S. 1, 21–22 (1968). To make an arrest, though (assuming the officer has no warrant), an officer must have something more—"probable cause." *Navarette*, 572 U.S. at 397; *District of Columbia v. Wesby*, 583 U.S. 48, 56 (2018).

First, reasonable suspicion. Police may conduct *Terry* stops when they have a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette*, 572 U.S. at 396 (internal quotation marks omitted); *see Terry*, 392 U.S. at 21–22. During the stop, officers can only use means "reasonably related" to the basis for the stop. *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015) (internal quotation marks omitted). If the manner and length of the stop exceed that scope, the stop "ripens into an arrest." *Id.*

Next, probable cause. "Probable cause" is what entitles an officer to stop a person and arrest him without a warrant. *Wesby*, 583 U.S. at 56. To have probable cause, the officer must perceive facts that would make a reasonable person suspect a "probability or substantial chance of criminal activity." *United States v. Moncivais*, 401 F.3d 751, 756 (6th Cir. 2005) (internal quotation marks omitted); *see Barton v. Martin*, 949 F.3d 938, 950 (6th Cir. 2020).

At a minimum, Officer Boss had reasonable suspicion to stop Cook. On a random license plate check, the truck turned up as "stolen" in Officer Boss's police database. And auto theft is a felony. Ohio Rev. Code § 2913.02(B)(5). So putting two and two together, Boss concluded—as

any reasonable person would—that the driver might have committed a felony. That conclusion was no "mere hunch." *Navarette*, 572 U.S. at 397 (internal quotation marks omitted). The truck's entry in the database gave Boss a "particularized and objective basis" for doing what he did. *Id.* at 396 (internal quotation marks omitted); *see United States v. Sandridge*, 385 F.3d 1032, 1036 (6th Cir. 2004) (officer had reasonable suspicion to stop car after license plate check reported that driver did not have valid license); *cf. United States v. Henley*, 469 U.S. 221, 230–31 (1985) (officers may rely on properly issued flyers or bulletins from other law enforcement sources and jurisdictions). Even Cook thinks so. He testified that if the truck "was listed as stolen, [he] could have been pulled over." R. 42-2, Cook Dep. v2, p.24, PageID 1481. We agree.

We doubt that Cook's temporary detention ripened into arrest, so we doubt that the officers needed probable cause. Ordering a person out of a car at gunpoint, briefly handcuffing him, and frisking him do not automatically make the stop an arrest if these actions are tailored to the needs of the circumstances, including the possible threat to officer safety and the severity of the suspected crime. *Brown*, 779 F.3d at 415. The officers reasonably suspected Cook of felony auto theft during a traffic stop in the middle of the night. And auto thieves sometimes carry guns, presenting a possible threat to law enforcement. *See, e.g.*, *State v. Lipkins*, No. L-21-1046, 2021 WL 5861270, at *1 (Ohio Ct. App. Dec. 10, 2021) (thief stole car from dealership with a gun and drove off); *State v. Drane*, No. 28757, 2021 WL 942921, at *1–3 (Ohio Ct. App. Mar. 12, 2021) (thieves stole car and drove around at 2:00 AM shooting bystanders before crashing into someone's garage). So the officers had reason to have their guns at the ready until Cook was handcuffed and they realized he was unarmed (at which point they holstered their guns). *See Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020) (officer may conduct *Terry* stop with gun drawn if he "reasonably fears for his safety"). And the officers had reason to handcuff Cook until they verified that he owned

10

the truck (at which point they removed the cuffs). *See United States v. Jacob*, 377 F.3d 573, 578–80 (6th Cir. 2004) (officers' ordering drug trafficking suspect out of car at gunpoint, handcuffing him, and putting him in police car for about fifteen minutes was reasonable and did not ripen into an arrest "while the officers pursued their investigation in an attempt to confirm or dispel their suspicions").

But even if the officers' actions were an arrest, albeit a brief one, they had probable cause. Until they verified Cook's story, they had it on good authority that he was driving a stolen vehicle. A natural inference is that the driver of a stolen vehicle may have stolen the vehicle. There was a "substantial chance" that was true—enough to support probable cause. *Moncivais*, 401 F.3d at 756 (internal quotation marks omitted); *see United States v. Conley*, No. 21-1723, 2023 WL 165966, at *3–4 (6th Cir. Jan. 12, 2023) (officer had probable cause to make arrest after database check showed that driver lacked insurance or license). So on any theory, Cook's unlawful stop claim fails.

Cook tries to avoid this conclusion by questioning Officer Boss's basis for thinking that the truck was stolen. First, Cook stresses that he'd gotten new license plates after he recovered the truck, arguing that Boss couldn't have run a plate check of the old (stolen) ones that the truck no longer displayed. But even if Cook obtained and registered new *plates* with the Ohio Bureau of Motor Vehicles, the new plates still would have been tied to the same *vehicle*, which Ohio tracks or tags with other means, like the VIN. *See* R. 53-1, Ohio BMV Replacement Plate Form, p.2, PageID 1806 (requesting vehicle plate number, year, make, model, serial number, certificate of title number, and other information). So Cook's argument goes nowhere.

Second, he turns to arguing that Boss couldn't see the truck's VIN while driving. True enough, but no one thinks that's what happened. Boss didn't testify that he observed or checked

a VIN. He testified that he put the license plate number into his database and that the vehicle came up stolen. And Cook admitted as much in his deposition. After listening to police dispatch calls made during the stop in which the dispatch officer confirmed that the truck was tagged as stolen, Cook was asked if he had "any reason to dispute that [police] pulled [him] over because [his] vehicle was listed as stolen." R. 42-2, Cook Dep. v2, p. 35, Page ID 1492. He answered "No." *Id.* Cook has put forth no evidence contradicting Boss's testimony or the dispatch call, or putting it in any doubt. His speculation that Boss couldn't have suspected that the truck was stolen is just that—speculation. That's not enough to defeat summary judgment. *See Walden*, 119 F.4th at 1056.

Finally, Cook claims that the officers knew him from prior meetings with Lyndhurst police, and that they should have known that the truck belonged to his construction company. But he appears to conflate other Lyndhurst officers he knew with Officer Boss, whom he did not know. In his deposition, Cook discussed a series of interactions with a Lieutenant Dubois and another officer that took place sometime before the truck theft; the officers asked Cook not to park a construction truck in his residential neighborhood. But Cook never asserted that he knew *Officer Boss*. And when asked if he'd ever met Boss, Cook answered "No." R. 42-1, Cook Dep. v1, p.155, PageID 1407. Officer Boss was the one who pulled him over, so Officer Boss's prior (non)relationship with Cook is the only one that would matter. Since nothing in the record even hints that Officer Boss knew Cook, Cook's argument falls flat.

We sympathize with Cook's plight. He testified that he "was in fear of [his] life," *id.*, and in his position, who wouldn't be? Cook had done nothing wrong and yet found himself with red and blue lights flashing as the police ordered him onto his knees in the street at gunpoint in the middle of the night. But the law looks at the officers' perspective, not Cook's. *See Baynes v.*

*Cleland*, 799 F.3d 600, 607–08 (6th Cir. 2015). And it asks what they knew *at the time*. *Id.* Not what they found out later on. At the time of the stop, the officers had only two pieces of information—a certain Dodge Ram 3500 was identified as stolen, and that same Dodge Ram 3500 sat right in front of them. (And keep in mind that, if anything, Cook helped create the whole mishap by not bringing his recovered truck in for police to inspect.) Had the real thief been driving the truck, Cook would have wanted the officers to do exactly what they did.

The traffic stop did not violate the Fourth Amendment.

**B.**

Cook next claims that the officers used excessive force in handcuffing him.[2] "A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014). To see whether officers acted reasonably in handcuffing a person, we ask whether (1) the person complained of tightness or pain, (2) the officer ignored the complaints, and (3) the person suffered an injury from the handcuffs. *Hughey v. Easlick*, 3 F.4th 283, 289 (6th Cir. 2021).

Officer Romanin acted reasonably and did not use excessive force. When he first handcuffed Cook, he used two sets of attached cuffs, effectively creating one set of double-length cuffs that wouldn't pull Cook's arms so far back, giving him more freedom of movement. Later on, when Cook complained of pain from the handcuffs, each time Romanin responded in thirty seconds or less. At the first request, Romanin was in the middle of searching Cook's wallet. As the video shows, the officer took some thirty-odd seconds to put the wallet back together, put it away, and pull on gloves before adjusting the cuffs. At the second request, about five minutes

---

[2] Cook cites the fact that the officers had guns drawn in his excessive-force claim, too. For the reasons already discussed, the officers acted reasonably in having their guns drawn for a felony auto theft stop.

later, the video shows that Romanin began working on the cuffs immediately and removed them altogether.[3] So at no time did Romanin "ignore[]" Cook's requests or give a "dismissive response." *Hughey*, 3 F.4th at 289; *Baynes*, 799 F.3d at 609.

Cook tries to sidestep the video with dramatic claims about the officers' conduct. In boilerplate fashion, he alleges that the officers "improperly, violently, excessively, and unnecessarily handcuffed" him, that they "failed and/or refused to respond and/or aid" him, and that their acts "were malicious and/or characterized by hatred, ill will and/or a spirit of revenge." Appellant Br. at 10–11; R. 1-2, Am. Compl., p.6–10, PageID 18–23. But the body-camera footage is clear as can be. There is no "he said, she said" for a factfinder to resolve. Officer Romanin was polite and professional, even friendly, and acted diligently to relieve Cook's discomfort. He repeatedly accommodated Cook when Cook mentioned his bad rotator cuff, knee surgery, and broken thumb. Because Cook's allegations are "blatantly contradicted" and "utterly discredited" by the video evidence, his excessive-force claim fails as a matter of law. *Scott*, 550 U.S. at 380.

The handcuffing did not violate the Fourth Amendment.

## C.

Cook's third claim concerns the home entry. Or does it? Though his briefing discusses this "claim," we see nothing in his Amended Complaint asserting it or spelling out facts that would support it. While the Amended Complaint makes claims for an "unlawful and unconstitutional

---

[3] Officer Romanin's friendly and courteous conduct went well beyond the minimum the law required of him. While officers must handcuff suspects in a reasonable manner, and cannot ignore cries of pain, they need not drop everything right away, say, if they are securing a scene or addressing an active threat. (Nor must they remove cuffs entirely; they did so here only once Cook's story checked out.) Handcuffing is inherently uncomfortable. And sometimes "embarrassing." *Tarter v. Metro. Nashville Airport Auth.*, No. 22-5421, 2023 WL 5322418, at *8 (6th Cir. Aug. 18, 2023). But it's a fact of life in police work. Here, the scene was secure, Cook was unarmed and cooperative, and, as the officers began to realize, he'd done nothing wrong. In a different case with different facts, "reasonable" measures might be different ones.

stop" and "excessive force," and alleges facts that, if true, could sustain these claims, nowhere does it allege that Officers Boss and Vasas unlawfully entered or searched his home.[4] R. 1-2, Am. Compl., p.5–12, PageID 18–25. And as far as facts go, Cook only states that the officers "escorted the Plaintiff's wife into the Plaintiff's home," where she "substantiated ownership of the Vehicle." *Id.* at p.7, PageID 20. That's it. Nothing about trespass, nonconsent, duress, or the like—no hint of alleged impropriety or any violation of the law.

Yes, Cook asserts a claim and spells out more facts in support in his briefs. But if a complaint fails to make a claim, the plaintiff generally "cannot cure the deficiency by inserting the missing allegations in a document that is not either a complaint or an amendment to a complaint." *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 484 (6th Cir. 2020) (internal quotation marks omitted). And the court can't generate claims either, constructively amending the complaint for the plaintiff. *See Brown v. Matauszak*, 415 F. App'x 608, 613 (6th Cir. 2011). So it's not clear where Cook gets his unlawful entry "claim" from.

In any event, Cook fails on the merits. He has not carried his burden to overcome qualified immunity. First, he has established no rights violation. And second, he has done next to nothing— cited no caselaw, discussed no specifically defined rights—to show that what the officers did violated clearly established law.

The Fourth Amendment generally bars warrantless entries of a person's home, but police can enter if someone validly consents to the entry. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)). Either express or implied consent will

---

[4] To be sure, the Amended Complaint uses the word "search" when stating Fourth Amendment claims. But those passages refer to the search of Cook's person, out on the street, not to the separate home search. *See* R. 1-2, Am. Compl., p.7, PageID 20 ("The Defendants engaged in . . . [the] unconstitutional stop, search, seizure, detention, securing, and/or arrest of the Plaintiff.").

work. *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (en banc). A person can give consent in so many words but can also consent with gestures or conduct. *Id.*; *see also United States v. Bowser*, 505 F. App'x 522, 524–26 (6th Cir. 2012) (finding implied consent via gestures even when officers did not expressly ask to search). "Although a man's home is his castle, trumpets need not herald an invitation." *Carter*, 378 F.3d at 589.

McDade first gave implied consent, and then gave express consent. Boss and Vasas rang the doorbell, and she opened the door. Boss and McDade spoke about finding paperwork for the truck. Then McDade stated that she was in the middle of looking for it, turned and walked back into the house with the door still open, and kept talking. She ascended the stairs, located just inside the open front door. After a few moments, Boss took two steps over the doorway to call another question up to her. And she answered. So by opening the door, speaking with Boss, and then heading back inside while still carrying on the conversation, McDade impliedly permitted Boss to continue the conversation and remain within earshot, even if that meant stepping through the open door to hear her from the bottom of the stairs. *See Bowser*, 505 F. App'x at 524–26 (after speaking with officers, suspect gave implied consent to search his cooler by pushing it in their direction, even though they hadn't asked to search it); *Smith*, 821 F.3d at 711–12 (finding that a child gave "objective indications" of consent to home entry by waiting for officers and opening door for them, even though she later claimed that she did not invite them in); *see also United States v. Reynolds*, 646 F.3d 63, 73 (1st Cir. 2011) (suspect gave implied consent to search bed by gesturing toward it even though officers hadn't asked to search it). Other circuits have let officials do more with even less. *See Gerald M. v. Conneely*, 858 F.2d 378, 384–85 (7th Cir. 1988) (homeowner gave officer implied consent to enter her home, even after she told him at the door "wait here," because she did not object to his following her into the home and she warned him to watch out for the puppy in the

kitchen); *Artes-Roy v. City of Aspen*, 31 F.3d 958, 960–62 (10th Cir. 1994) (no Fourth Amendment violation when city building inspector and a police officer took a few steps inside the door to speak with construction workers, though homeowner wasn't there).

At that point, Boss briefly stepped back outside and spoke over the radio with Officer Romanin. He then stepped back into the entryway and called upstairs again to McDade to ask if she'd found the papers. And he asked for permission to go up the stairs. She shouted back that he could. And so he did. Because he had McDade's "voluntary, unequivocal, [and] specific" consent, this further entry satisfied the Fourth Amendment. *Bowser*, 505 F. App'x at 525 (internal quotation marks omitted).

This case is not like *Smith v. City of Wyoming*, where a homeowner and her friend opened the door to police but repeatedly declined to speak with them before the police barged in. 821 F.3d at 710. Nor is this a case like *United States v. Little*, where an officer accompanied a suspect into his house all the way to the bedroom and watched him get dressed, without ever asking. 431 F. App'x 417, 419–20 (6th Cir. 2011). Boss spoke with McDade at the door and both wanted to find paperwork to clear Cook as soon as possible. They spoke, and as she moved up the stairs, he stayed at the entryway but within earshot. Then, before he pressed any further into the house or up the stairs, he asked for and received express permission. Boss's actions were reasonable, and thus lawful under the Fourth Amendment.

Even if one finds the rights-violation question a close one, Cook has failed to show that any right was clearly established. It's his burden to prove that "then-existing precedent" put the constitutionality of Boss's conduct "beyond debate." *Wesby*, 583 U.S. at 62–63 (internal quotation marks omitted). That requires on-point, in-circuit authority or an unmistakable consensus of persuasive caselaw that every reasonable officer would know prohibited his conduct. *Id.*

17

Cook gives us nothing close to that. His brief cites a few cases for basic propositions of law (like "an officer may not enter a home absent a warrant or an exception to the warrant requirement" or that consent is one of those exceptions). And he then applies those rules to the facts of his case as follows: "In the instant matter, the Appellant clearly and unequivocally had a privacy right and Appellees [] clearly and unequivocally unconstitutionally invaded his home." Appellant Br. at 42. That's it. No specific caselaw. No engagement with specific facts or circumstances. But overcoming qualified immunity requires much more than that. *See Ashford v. Raby*, 951 F.3d 798, 801 (6th Cir. 2020) (plaintiffs must "point to precedent finding a Fourth Amendment violation in similar circumstances"); *Wesby*, 583 U.S. at 64 (stressing that we must define the right specifically, at a low level of generality). Cook cites no case with similar facts,[5] and we know of none, that would clearly establish Boss's conduct as unconstitutional.

## D.

Cook also charges the officers with failing to intervene in each other's constitutional violations. Plaintiffs can do that under § 1983, *see Chaney-Snell v. Young*, 98 F.4th 699, 721–22 (6th Cir. 2024), but there must be an actual constitutional violation first. As discussed above, there were none. So the district court properly granted summary judgment.

## V.

Finally, Cook seeks to hold the cities of Cleveland and Lyndhurst liable for their officers' constitutional violations. *See Monell*, 436 U.S. 658. But again, there must first be a constitutional

---

[5] The reply brief improves on the opening brief—it cites one case with superficially similar facts, in that certain officers spoke with a suspect at his door before entering. Reply Br. at 8 (citing *Cummings v. City of Akron*, 418 F.3d 676 (6th Cir. 2005)). Its facts have little bearing here, though, because the *Cummings* homeowner expressly denied an officer's request to enter his home, after which the officer stuck his foot in the door to prevent it from closing and then pushed his way in. *Cummings*, 418 F.3d at 679. None of that happened with Boss and McDade.

violation. *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014). Since we find none, this claim fails too. And that's even putting aside the fact that Cook hasn't identified any Cleveland officers involved here—Officers Boss, Vasas, Romanin, and Blatnick were Lyndhurst employees.

## VI.

Cook has no evidence, let alone "significant probative evidence," putting what happened here in any real doubt. *Green Genie*, 63 F.4th at 526 (internal quotation marks omitted). We affirm summary judgment for the defendants.